1   Christopher S. Morris, Esq., SBN 163188
    cmorris@morrislawfirmapc.com
2   MORRIS LAW FIRM, APC
    501 West Broadway, Suite 1480
3   San Diego, CA 92101
    Telephone:  (619) 826-8060
4   Facsimile:  (619) 826-8065

5   Attorneys for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  ZEETOGROUP, LLC; TIBRIO, LLC,    Case No.  '19CV0458 JLS  NLS

12                      Plaintiffs,    **COMPLAINT FOR DAMAGES**

13          v.

14  NICHOLAS FIORENTINO, an
    individual; SABIHA TUDESCO, an
15  individual; INTERNET THINGS,
    LLC; SIMPLY SWEEPS, LLC;
16  CREDIREADY, LLC; TWO
    MINUTE MEDIA TOPICS, LLC; and
17  DOES 1-100, inclusive,

18                      Defendants.

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# I.

## INTRODUCTION

1.      Stephan Goss ("Goss") was born in Switzerland.  Stephan emigrated from Switzerland in 2007 on a student visa.  Armed with nothing more than computer savvy and big ideas, shortly after arriving in the United States he joined Zeetogroup, LLC ("Zeeto"), a lead generation dot com company with 2 employees. By 2018 Goss was living the American dream.  His company, Zeeto, was named by the San Diego Union Tribune as one of the top ten places to work in San Diego and Goss was personally named in Forbes 30 under 30 for his work at Zeeto, which he had bootstrapped to 73 employees.  Zeeto, and its subsidiary, Samples.com ("Samples") were generating millions of dollars, *a month*, in revenue.  But by the end of 2018, a new local competitor, Internet Things, LLC dba Internetthings.com ("Internet Things"), had not only opened up shop nearby, but had hired away key members of the Zeeto team, including Zeeto's Chief Revenue Officer, Sabiha Tudesco ("Tudesco").  Smelling a rat, Goss went to Internet Things's website, SimpleSweeps.com.  And when he did, it looked as though he was looking at his own websites.  The Zeeto websites and the Internet Things website were identical in many crucial ways.  He could tell it would be impossible for this to be a coincidence.  Zeeto had spent millions on research and development to perfect its sites.  It was clear that this new competitor was using and exploiting Zeeto's work. And while copycatting is nothing new in the world of dot com startups, as outlined below, what happened here was not copycatting – it was premeditated theft.

2.      As of this writing, two former Zeeto employees -- members of the team that had been hired away -- have come forward.  One such employee, Rocky Iorio ("Iorio"), has provided Zeeto with a Skype Chat between himself and the founder of Internet Things, Nick Fiorentino ("Fiorentino").  In this Skype Chat, which occurred while Iorio was still employed at Zeeto but had already accepted an offer from Internet Things, Fiorentino blatantly asks Iorio for Zeeto's top

2

COMPLAINT

1    performing client list.  This list not only sets forth the names of the clients, but

2    contains the "secret sauce" of Zeeto, including the revenue generated by the various

3    ads run on the Zeeto platform, performance data for each campaign and the order in

4    which they were prioritized by Zeeto's proprietary algorithm.

5        3.    The information contained in the list was the result of years of

6    analysis, including the side-by-side comparisons of tens of thousands of ads run on

7    the Zeeto platform to optimize performance.  The top performing clients, especially

8    along with the top performing ads, is *invaluable* information.  Fortunately, Iorio

9    retained this entire conversation and recently cleared his conscious by providing the

10   entire Skype Chat to Goss and his legal team.  The conversation, and the client lists

11   that were sent over, are attached to the Complaint as Exhibit 1.  The list is left

12   intentionally blurred so as to protect the information contained therein.

13       4.    Unfortunately, the improper actions of Fiorentino did not end with the

14   list.  Fiorentino, and a Doe Executive, also poached Corey O'Neal to copy Zeeto's

15   media buying strategy and build a site identical to Zeeto using Zeeto's testing

16   results.  Fiorentino and a Doe Executive poached Tudesco to copy Zeeto's sales and

17   account management strategy.  Fiorentino and a Doe Executive poached Ari Sumon

18   to copy Zeeto's SMS strategy.  This was a clear and calculated effort, backed by

19   substantial bonus compensation packages, to misappropriate Zeeto's trade secrets

20   and intellectual property so that Internet Things could copy Zeeto's business model.

21   Internet Things specifically recruited the key people required to copy Zeeto's

22   business.  As described below, the similarities between Zeeto and Internet Things is

23   hard to ignore.

24       5.    Based on information and belief, Fiorentino became aware of Zeeto's

25   key players from a Doe Executive who is adverse to Zeeto and not yet named in

26   this action.

27       6.    Therefore, this matter is much more than a customer list being

28   misappropriated.  These actions have caused Zeeto to lose profits, suffer a decrease

3

COMPLAINT

1  in their market value and worst of all, because of the tremendous losses in revenue,

2  Zeeto had to lay off 26 of its 72 employees.

3      7.    Goss, through and on behalf of Zeeto, brings this action, first and

4  foremost, to protect his intellectual property.  That his life's work was transmitted

5  with a simple key stroke to an ill- intended competitor, Internet Things, is truly

6  unfortunate.  That Internet Things is now exploiting this work for its own personal

7  gain and to the detriment of Zeeto is shameful and it is actionable.  This out and out

8  cyber piracy must be stopped.  By virtue of this action, Zeeto will respectfully

9  request this Court to enter an injunction prohibiting Internet Things from doing

10  anything to exploit the trade secrets that it stole from Zeeto, including but not

11  limited to doing business with any of the clients on the list found as part of Exhibit

12  1.

13                              **II.**

14                           **PARTIES**

15      8.    Plaintiff ZeetoGroup, LLC ("Zeeto"), is a Delaware Limited Liability

16  Company conducting business in San Diego, California and owns and operates

17  Tibrio, LLC, getitfree.us, and samples.com.  Zeeto previously employed Iorio.

18  Before Iorio left Zeeto, Defendant Nicholas Fiorentino, Iorio's soon-to-be boss,

19  instructed Iorio to disclose Zeeto's buyers, which Iorio did.  Once Iorio began

20  working for Mr. Fiorentino, Fiorentino requested that Iorio create a platform using

21  Zeeto's proprietary information.  Fiorentino also poached other employees from

22  Zeeto with the goal of re-creating Zeeto's proprietary platform.  Plaintiffs have

23  suffered severe harm due to these actions.

24      9.    Plaintiff Tibrio, LLC ("Tibrio"), is owned and operated by Zeeto and

25  runs the websites getitfree.us and samples.com.  Nicholas Fiorentino used improper

26  methods to obtain the identity of Tibrio's customers and copy the Tibrio platform,

27  causing substantial harm to Tibrio's business.

28  / / /

COMPLAINT

10.     Nicholas Fiorentino ("Fiorentino") is the Chief Executive Officer of Internet Things, LLC.  In November and December of 2018, Fiorentino requested Iorio disclose confidential information and trade secrets he had acquired while employed by Zeeto.  Fiorentino also recruited other employees from Zeeto so he could re-create Zeeto's proprietary platform.  As the CEO of Internet Things, Fiorentino is personally liable to Plaintiffs because he ordered, authorized, and participated in the conduct alleged herein.  (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785.)

11.     Sabiha Tudesco ("Tudesco") was the Chief Revenue Officer at Tibrio, which is owned and operated by Zeeto.  After being hired away by Internet Things, LLC, Tudesco took the client list of Tibrio, produced by Iorio, and knowingly and maliciously exploited that list to the detriment of Zeeto and Tibrio.

12.     Internet Things, LLC ("Internet Things") is a company that owns and operates Simply Sweeps, LLC, CrediReady, LLC, and Two Minute Media Topics, LLC. Nick, as the CEO of Internet Things, willfully and maliciously caused trade secrets to be misappropriated from Plaintiffs Zeeto and Tibrio.  Internet Things then conspired with all of its companies to use the misappropriated information.  This has caused Plaintiffs substantial harm.

13.     Simply Sweeps, LLC ("Simply Sweeps") owns and operates simplysweeps.com.  Simply Sweeps competes directly with Plaintiffs in the market of lead generation and data management.  Simply Sweeps has conspired with Internet Things to use Zeeto and Tibrio's misappropriated trade secrets.  This has caused Plaintiffs substantial harm.

14.     CrediReady, LLC ("CrediReady") owns and operates crediready.com and approvedcar.com.  CrediReady competes directly with Plaintiffs in the market of lead generation and data management.  CrediReady has conspired with Internet Things to use Zeeto and Tibrio's misappropriated trade secrets and confidential information.  This has caused Plaintiffs substantial harm.

COMPLAINT

15.    Two Minute Media Topics ("Two Minute") owns and operates twominutetopics.com.  Two Minute competes directly with Plaintiffs in the market of lead generation and data management.  Two Minute has conspired with Internet Things to use Zeeto and Tibrio's misappropriated trade secrets and confidential information.  This has caused Plaintiffs substantial harm.

16.    The true names and/or capacities, whether individual, corporate, associate, partnership, trust, or otherwise of defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs, who therefore sues said defendants by such fictitious names.  Plaintiffs are informed and believe, and thereon alleges, that defendant fictitiously named herein as a DOE was legally responsible, negligently, or in some other actionable manner, for the events and happening hereinafter referred to, and thereby proximately caused the injuries and damages to Plaintiffs as hereinafter alleged.  Plaintiffs will amend this Complaint to allege the true names and capacities of these DOES and when they have been ascertained.

### III.

### JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over Plaintiffs' federal trade secret claim pursuant to 18 U.S.C Section 1832-39 et seq., and 28 U.S.C. Sections 1331 and 1343.  The court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. Sections 1391(b)(1) and (2).

18.    This Court has jurisdiction and venue is proper over Defendants because the events complained of occurred in San Diego County.

### IV.

### CONSPIRACY ALLEGATIONS

19.    On information and belief, at all relevant times hereto, Internet Things, LLC ("Internet Things"), Simply Sweeps, LLC ("Simply Sweeps"), and CrediReady, LLC ("CrediReady") (collectively referred to as "Entity Defendants")

6

COMPLAINT

1  and Nicholas Fiorentino ("Fiorentino") conspired and planned, one with another, to

2  misappropriate trade secrets from Plaintiffs ZeetoGroup, LLC and Tibrio, LLC

3  ("Zeeto") by convincing and enticing Zeeto employees to disclose confidential

4  information and trade secrets.  Fiorentino, as the CEO of Internet Things used his

5  personal influence and authority over the Entity Defendants in carrying out this

6  conspiracy to misappropriate and steal trade secrets and confidential information.

7       20.    Internet Things owns and operates the other Entity Defendants.  Once

8  the misappropriated information was collected by Internet Things, Internet Things

9  conspired with Simply Sweeps and CrediReady who became a party to every act

10  previously and subsequently done by Fiorentino and Internet Things.  Simply

11  Sweeps and CrediReady had full knowledge of the prior acts of Fiorentino and

12  Internet Things, and overall actively participated in the actions which has caused

13  Plaintiffs substantial harm.  As joint tortfeasors, the Entity Defendants are all liable

14  for the entire damage done in pursuance of the common design.

15       21.    Plaintiffs are ignorant of the true name and capacities, whether

16  individuals or otherwise of Defendants sued as Does 1 through 50, inclusive and

17  therefore sues these Defendants by such fictitious names.  Plaintiffs will amend this

18  Complaint to allege their true names and capacities when ascertained.  Plaintiffs are

19  informed and believe, and thereon allege, that each of the fictitiously named

20  Defendants are responsible in some manner for the occurrence alleged, and that

21  Plaintiffs' injuries herein alleged were proximately caused by such Defendants.

22                                           **V.**

23                **ALTER EGO AND CONSPIRACY ALLEGATIONS**

24       22.    "Under the alter-ego doctrine, when the corporate form is used to

25  perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or

26  inequitable purpose, the courts will ignore the corporate entity and deem the

27  corporation's acts to be those of the person or organizations actually controlling the

28  / / /

COMPLAINT

corporation, in most instances the equitable owners." (*Sonara Diamond Corp. v. Superior Court* 83 Cal.App.4th 523, 538 (2000).)

23.    "In California, two conditions must be met before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be inequitable result if the acts in question are treated as those of the corporation alone." (*Sonara Diamond Corp. v. Superior Court*, supra, 83 Cal.App.4th at 538.)

24.    During all relevant times, Fiorentino and DOES 1-100, were leaders and executives at Internet Things, LLC, ("Internet Things") Simply Sweeps, LLC ("Simply Sweeps") and CrediReady, LLC ("CrediReady"), (collectively referred to as "Entity Defendants")

25.    At all relevant times, Fiorentino and DOES 1-100, as officers and shareholders, commanded, influenced, and controlled the affairs of the Entity Defendants. Fiorentino and DOES 1-100 acted outside of any agency relationship afforded by Entity Defendant's corporate status and in fact acted in such a way as to completely disregard and ignore any recognized corporate formalities or purpose with regards to the Entity Defendants' operation.

26.    At all relevant times, there existed a unity of interest and ownership between the Entity Defendants, Fiorentino, and DOES 1-100 such that the individuality and separateness of the Entity Defendants, Fiorentino, and DOES 1-100 ceased to and in fact never did exist.

27.    Fiorentino and DOES 1-100 used the Entity Defendants as a mere shell and naked framework for their own benefit.  In this regard, Fiorentino and DOES 1-100 used the Entity Defendants as a conduit to conduct his/her personal business, property, and affairs and as a device to avoid individual liability.

/ / /

COMPLAINT

28.     Upon information and belief, Fiorentino, DOES 1-100, and Entity Defendants conspired and planned, one with another, to defraud Plaintiffs by employing Zeeto's employees and persuading them to disclose propriety information.

29.     Fiorentino, DOES 1-100, and the Entity Defendants were members of this conspiracy from the inception.  As active participants in the conspiracy, Fiorentino, DOES 1-100, and the Entity Defendants are joint tortfeasors liable for the entire damage done in pursuance of the common design.

## VI.

## **STATEMENT OF FACTS**

30.     Zeetogroup, LLC and Tibrio, LLC ("Zeeto") own and operate two websites: samples.com and getitfree.us.  Both sites aggregate free samples ranging from cleaning supplies to snack foods and give them away to customers who visit their websites.  There is also a sweepstakes aspect to Zeeto's getitfree.us website whereby in exchange for answering certain questions, a consumer will be placed into a drawing.

31.     In order to make money off of giving away product for free, Zeeto has developed a proprietary platform (the "Platform") to collect information from consumers by asking them questions and then, based on their responses, connecting them with advertisers.

32.     Upon visiting Zeeto's websites, a consumer is presented with a list of different products to choose from.  Once a consumer has decided what they are interested in, they are asked several questions and are shown ads based on the answers.  At the end, the consumer can either receive free samples or enter into a sweepstakes.

33.     Zeeto makes money off of these websites by, (1) connecting consumers to advertisers, and (2) allowing advertisers to put ads on the websites. In order to command the highest price possible, Zeeto has spent years developing the

9

COMPLAINT

details of samples.com and getifree.us which attract visitors and encourage them to click on an advertisement or connect with a relevant advertiser.

34.    The details which make Zeeto's websites different, and more profitable, include the way questions are phrased; the style of a border around an advertisement; what type of incentive is offered by an advertiser; and, the overall appeal of the website.  It took Zeeto years of research and hundreds of thousands of dollars in investments to learn what worked the best.  Something as simple as the style of the border around an advertisement may increase overall sales by 7%.  The only way to know this, however, is by investing a considerable amount of money. This efficiency is why advertisers agree to work with Zeeto.

35.    The market in which Zeeto conducts business is highly saturated and in order to gain traction and command a higher price, a company must stand out. Zeeto stands out because they are not a simple lead generation company. Instead, they ask specific questions and gain information that advertisers covet, making leads and ads much more valuable than simple contact information offered by normal lead generation companies.

36.    Zeeto believes that it is this platform, painstaking research and development, testing, and its employees that have made the concept a success for so long.  Researching what method works the best, and actually building the websites tailored to that research, is what made Zeeto the success it was before its client lists and trade secrets were stolen.

37.    Many of the advertisers have a specific and limited advertising budget that they spend every month.  Money spent on competing sites like Internet Things, immediately detracts from Zeeto's bottom line.  In essence, advertising budgets are a zero sum game.

38.    Nicholas Fiorentino ("Fiorentino") is the CEO of Internet Things, LLC, ("Internet Things") which owns and operates Simply Sweeps, LLC dba

/ / /

10

SimplySweeps.com, CrediReady, LLC dba CrediReady.com, and Two Minute Media Topics, LLC dba TwoMinuteMediaTopics.com.

39.    Internet Things, following the misappropriation of trade secrets alleged herein, now employs the same business model as Zeeto, and is therefore in direct competition. Before the misappropriation, Internet Things was a simple lead generation company and was not using a model even remotely similar to Zeeto's.

40.    In 2015, Rocky Iorio ("Iorio") began working for Zeeto as a Media Email Publisher and was later promoted to Affiliate Marketing Manager in 2016. As an Affiliate Marketing Manager, Iorio brought in visitors to Zeeto's websites by working with different search engines and affiliates.

41.    Iorio's Employment Agreement with Zeeto states that, "during your employment with the Company, you will not do anything to compete with the Company's present or contemplated business, nor will you plan or organize any competitive business activity."  Iorio also entered into a Proprietary Information and Inventions Assignment Agreement with Zeeto whereby he agreed to keep all of Zeeto's trade secrets confidential.

42.    On November 1, 2018, Iorio accepted a position with Fiorentino's company, Internet Things, to run their lead generation offers at their website, crediready.com. Iorio immediately gave Zeeto two weeks' notice.

43.    On November 9, 2018, at 4:22 p.m., while still performing services for Zeeto, Fiorentino sent a message to Iorio asking if he could "get a list of Samples' big buyers."  "Samples" as referenced by Fiorentino, is in reference to Zeeto's website, samples.com.

44.    In response, Iorio replied "Heh sec" meaning "chuckle" in a second. Iorio then obliged and sent screen shots of Zeeto's proprietary technology platform to Fiorentino listing around 76 of Zeeto's biggest advertising campaigns and all the associated metrics of each campaign.  A true and correct copy of this correspondence is attached hereto as "Exhibit 1."

45.    Included in this list were not only the names of Zeeto's big advertisers, but also what specific campaign was working most efficiently for Zeeto, how much revenue each campaign was generating, the price point at which the traffic was being sold, and competitive performance metrics on how the campaigns compared to each other.  Zeeto has spent considerable time and money figuring out what works for specific advertisers, what incentive (like a gift-card) drives consumers, and most importantly, which campaigns perform the best and how to prioritize them.  This information is the life blood of Zeeto.

46.    When asked why Iorio obliged Nick's request, Iorio stated that he felt pressured by Fiorentino because he had not yet started his position at Internet Things and wanted to show his new boss loyalty.  Plaintiffs appreciate Iorio doing the right thing by coming forward with this information.

47.    Around the same time, Fiorentino also recruited a number of other employees who had worked to build Zeeto's Platform, communicate with clients, and run special promotions for Zeeto's websites.  The employees included Corey O'Neal, Will Ehrich, Ari Sumon, and Sabiha Tudesco.  Fiorentino asked and incentivized these employees to do the same thing for Internet Things that they did for Zeeto, which resulted in an almost exact replica of Zeeto's platform.  These employees executed the same Employment Agreement and Proprietary Information and Inventions Assignment Agreement as Iorio.

48.    One of these employees was Sabiha Tudesco ("Tudesco").  Tudesco took the list that Iorio had stolen for Internet Things and exploited it for Fiorentino.  As the former Chief Revenue Officer for Zeeto, Tudesco was imminently familiar with the list and the associated metrics and therefore immediately saw it for what it was – the property of Zeeto.  Nevertheless, at the direction of Fiorentino, Tudesco contacted the clients on the list and recruited them into her network of clients at Internet Things.  Upon reviewing Internet Things's website, SimplySweeps.com, it was discovered that every single advertising campaign was a major Zeeto client.  In

12

addition to exploiting the property of Zeeto, by recruiting and attempting to recruit these clients, Tudesco disparaged and maligned Zeeto to the clients on the list.

49.    Tudesco, in August of 2018, and while representing Zeeto at conventions, solicited Zeeto's clients for her own website she was planning on launching.  This is a direct breach of her contractual obligations with Zeeto.  A true and correct copy of Tudesco's contract with Zeeto is attached hereto as Exhibits 2 through 9.

50.    Iorio's last day at Zeeto was on November 14, 2018, and his first day at Internet Things was November 15, 2018.

51.    On November 20, 2018, Fiorentino tasked Iorio with creating a platform using Zeeto's proprietary information.  Basically, Fiorentino asked Iorio to re-create Zeeto's Platform.  This project was later re-directed to another former Zeeto employee who had built the Zeeto websites, Corey O'Neal.

52.    On December 4, 2018, Iorio, without any notice, feedback, or explanation, was unceremoniously and suspiciously terminated by Fiorentino.  Thereafter, it became clear to Iorio that Fiorentino had hired him just to get the IP from Zeeto and that Fiorentino was willing to ruin people's lives in order to steal trade secrets from a competitor.  Other employees recruited by Fiorentino also suffered the same fate.

53.    Following this transfer of employees, Zeeto noticed a severe decline in funds from advertisers.  This decline averages around a million dollars a month.  Because an advertiser only has limited funds to spend, Zeeto now has to split those amounts with Internet Things, who had just copied Zeeto's methods using Zeeto's employees.  In addition Zeeto has had to deal with the disparagement caused by Tudesco reaching out to Zeeto's advertisers.  Therefore, Internet Things is purposefully attempting to endanger Zeeto's existence in order to grow their own profits.

/ / /

54.    Fiorentino, and a Doe Internet Things Executive, poached Iorio to gain access to Zeeto's client list.  Fiorentino and a Doe Executive poached Corey O'Neal to copy Zeeto's media buying strategy and build a site identical to Zeeto using Zeeto's testing results.  Fiorentino and a Doe Executive poached Tudesco to copy Zeeto's sales and account management strategy. Fiorentino and a Doe Executive poached Ari Sumon to copy Zeeto's SMS strategy.  It is believed that these employees were convinced to misappropriate Zeeto's trade secrets through large bonus compensation packages and possible equity.  Therefore, there was a clear and calculated effort to misappropriate Zeeto's trade secrets as Internet Things only recruited the key people that together would have all the trade secrets required and proprietary information to copy Zeeto's business.  This matter is much more than a customer list being misappropriated.

55.    In order to grow their own business, Defendants have taken affirmative steps to copy and harm Zeeto.  Defendants believe that once Zeeto is out the way, Defendants will be able to command the full advertising budget of Zeeto's customers.  Therefore, there is an incentive to steal Zeeto's concept and drive them out of business.  It is possible the other individuals who left Zeeto even took steps to purposely undermine Zeeto before they officially resigned, as Iorio did when he took screenshots of Zeeto's technology.

56.    Due to the actions of Fiorentino; Zeeto has suffered severe damages to their reputation, market value, profitability, and 26 people have lost their livelihood. Zeeto now seek the Court's assistance in protecting their trade secrets and the livelihood of the employees still with Zeeto.

/ / /

/ / /

/ / /

/ / /

/ / /

14

COMPLAINT

# VII.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS- CALIFORNIA CIVIL CODE SECTION 3426.1

## (PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1-100)

57.     Plaintiffs re-allege and incorporate all of the above paragraphs as though fully set forth herein.

58.     Plaintiffs own the identity of their premium customers and the technology/strategy behind their proprietary Platform which qualifies as Trade Secrets ("Trade Secrets").  These Trade Secrets provide a commercial advantage as defined by California Civil Code section 3426.1(d).

59.     At the time of their misappropriation, the Trade Secrets were not made readily available to anyone outside of Zeeto's employ.

60.     Defendants improperly acquired the Trade Secrets on or around November 9, 2018, and November 20, 2018, when Fiorentino asked Iorio to deliver a list of Zeeto's big buyers and help develop a platform using Zeeto's Trade Secrets.

61.     The improper means used by Defendants includes misrepresentations and inducement of a breach of a duty to maintain secrecy.  Specifically, Fiorentino used his leverage over Iorio and other former Zeeto employees, as their new boss, to misappropriate Trade Secrets from Zeeto.

62.     Fiorentino was aware that he had misappropriated the trade secrets of Zeeto by improper means.

63.     Defendants' acquisition was a substantial factor in causing Plaintiffs' harm and Defendants were unjustly enriched.

/ / /

/ / /

COMPLAINT

64.    The actions of Fiorentino qualify as willful and malicious misappropriation and therefore, the Court should award exemplary damages as provided by California Civil Code section 3426.3(c).

### SECOND CAUSE OF ACTION

### MISAPPROPRIATION OF TRADE SECRETS - 18 U.S.C.S. SECTION 1832 ET AL.

### (PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1-100)

65.    Plaintiffs re-allege and incorporate all of the above paragraphs as though fully set forth herein.

66.    Plaintiffs owns and possess certain confidential and trade secret information as alleged above.

67.    Plaintiffs' Trade Secrets relate to products and services used, sold, shipped, and/or ordered in, interstate or foreign commerce.

68.    Plaintiffs have taken reasonable measures to keep such information secret and confidential.

69.    Plaintiffs' confidential trade secret information derives independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

70.    Defendants have misappropriated Zeeto's Trade Secrets in the improper and unlawful manner as alleged herein.

71.    Defendants wrongful conduct in misappropriating Zeeto's Trade Secrets, unless and until enjoined and restrained by order of this Court, will cause great and irreparable harm to Zeeto.

72.    Zeeto is threatened with losing the value of its proprietary platform as well as current and potential business with top advertisers.  Zeeto will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants are enjoined from engaging in any further acts of misappropriation.

COMPLAINT

73.    Each of the acts of misappropriation were done willfully and maliciously by Defendants with the deliberate intent to injure Plaintiffs' business and improve their own business for financial gain.  This entitles Zeeto to exemplary damages and/or attorneys' fees to be proven at trial.

## THIRD CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

## (PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1-100)

74.    Plaintiffs re-allege and incorporate all of the above paragraphs as though fully set forth herein.

75.    Defendants intentionally interfered with the economic relationships between Zeeto and the different buyers of Zeeto, which probably would have resulted in an economic benefit to Plaintiffs.

76.    Plaintiffs and the buyers, whose information was willfully, maliciously, and improperly misappropriated, were in an economic relationship and probably would have resulted in more economic benefits to Plaintiffs.

77.    Defendants knew about this relationship and engaged in the wrongful misappropriation of the buyers contact information (in violation of California Civil Code section 3426.1) in order to disrupt Zeeto's economic relationships.  This was done intentionally, and Defendants were aware, that this would cause a disruption of the relationship which was substantially certain to occur.

78.    Defendants have used that contact list to reach out to buyers with a limited budget in order to usurp Zeeto's sales, which has disrupted Zeeto's relationships and caused economic harm.

/ / /

/ / /

/ / /

/ / /

17

COMPLAINT

## **FOURTH CAUSE OF ACTION**

## **UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES**

## **BUSINESS AND PROFESSIONS CODE SECTION 17200**

## **(PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1-100)**

79.     Plaintiffs re-allege and incorporate all of the above paragraphs as though fully set forth herein.

80.     California Business and Professions Code section 17200 prohibits unlawful, unfair, or fraudulent business acts.

81.     As described above, Defendants have a practice of using Zeeto's employees to misappropriate Trade Secrets.  Specifically, Fiorentino hired Iorio to obtain a list of Zeeto's big buyers and then hired other employees to re-create Zeeto's Platform.

82.     Defendants' actions are unlawful as they violate the trade secret acts as alleged herein.

83.     Defendants' actions are unfair because Defendants are using Zeeto's customer contact information and proprietary platform to generate business, which has materially damaged Zeeto.

84.     Defendants' actions are fraudulent because they promised a job to Iorio, siphoned information, and then terminated him shortly thereafter.  Defendants have done this to multiple Zeeto employees.

85.     Due to the practices of Defendants, Zeeto has suffered material damages in an amount over $1,000,000 a month since November of 2018.

86.     As the CEO of Internet Things, LLC, which owns and operates Simply Sweeps, LLC dba SimplySweeps.com, CrediReady, LLC dba CrediReady.com, and Two Minute Media Topics, LLC dba TwoMinuteMediaTopics.com, Fiorentino has been able to distribute the improperly obtained Trade Secrets among the various Defendants, causing substantial harm to Plaintiffs.

/ / /

COMPLAINT

### FIFTH CAUSE OF ACTION

### PRELIMINARY AND PERMANENT INJUNCTION/TEMPORARY RESTRAINING ORDER AGAINST MISAPPROPRIATION PURSUANT TO CALIFORNIA CIVIL CODE SECTION 3426.2, AND BUSINESS AND PROFESSIONS CODE SECTION 17203

### (PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1-100)

87.    Plaintiffs re-allege and incorporate all of the above paragraphs as though fully set forth herein.

88.    Actual or threatened misappropriation may be enjoined upon an application to the court.  (Civ. Code § 3426.2(a).)

89.    If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty. (Civ. Code § 3426.2(b).)

90.    A preliminary injunction/temporary restraining order is proper here as the information disclosed by Iorio confirm that Defendants are using Zeeto's Trade Secrets.  These actions are not only damaging to Zeeto, but they are unjustly enrich Defendants.

91.    Pursuant to California Business and Professions Code section 17203, any corporations who engages in unfair competition may be enjoined in any court of competent jurisdiction.  This order may be used to prevent the use or employment by any person of any practice which constitutes unfair competition. (Bus. & Prof. Code § 17203.)

92.    The basis for injunctive relief is irreparable injury and the inadequacy of legal remedies. (*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).)

93.    Plaintiffs are able to show that they are likely to succeed on the merits, that they will suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that the injunction is in the public

COMPLAINT

interest.  (*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).)

94.     The more time that passes, the more Zeeto loses out on their market share. It is clear that the customer list was misappropriated and Internet Things seeks to destroy Zeeto.  Therefore, the practices of using the list and trade secrets must be stopped.

95.     Plaintiffs therefore request an injunction to stop Defendants from working with any of the customers sent by Iorio and to discontinue use of any information obtained through Zeeto employees.

## SIXTH CAUSE OF ACTION
## BREACH OF CONTRACT
## (PLAINTIFFS AGAINST SABIHA TUDESCO AND DOES 1-100)

96.     Plaintiffs re-allege and incorporate all of the above paragraphs as though fully set forth herein.

97.     Tudesco entered into an employment contract with ZeetoGroup, LLC on August 15, 2015 to become Zeeto's Director of Business Development.  This employment agreement is attached hereto as "Exhibit 2."  Tudesco also entered into a Proprietary Information and Inventions Assignment with ZeetoGroup, LLC on September 8, 2015.  This agreement is attached hereto as "Exhibit 3."

98.     Tudesco entered into an agreement with ZeetoGroup, LLC on November 1, 2015 to become Zeeto's Director of Sales.  This employment agreement is attached hereto as "Exhibit 4."  Tudesco also entered into a Proprietary Information and Inventions Assignment with ZeetoGroup, LLC on November 6, 2015.  This agreement is attached hereto as "Exhibit 5."

99.     Tudesco entered into an agreement with Tibrio, LLC on August 15, 2018 to become Tibrio's Chief Revenue Officer.  This employment agreement is attached hereto as "Exhibit 6."  Tudesco also entered into a Proprietary Information

/ / /

COMPLAINT

and Inventions Assignment with Tibrio, LLC on August 15, 2018.  This agreement is attached hereto as "Exhibit 7."

100.   On August 23, 2018, Tudesco was promoted to the Chief Revenue Officer.  A true and correct copy of her offer letter is attached hereto as "Exhibit 8."

101.   Finally, Tudesco entered into a Termination Certification Agreement on December 3, 2018.  A true and correct copy of this agreement is attached hereto as "Exhibit 9."

102.   The agreements attached hereto as exhibits 2 through 9 forbid Tudesco from sharing any confidential information or performing any tasks which may harm ZeetoGroup, LLC and Tibrio, LLC.

103.   As described above, Tudesco took the list that Iorio had stolen for Internet Things and exploited it for Fiorentino.  As the former Chief Revenue Officer for Zeeto, Tudesco was imminently familiar with the list and the associated metrics and therefore immediately saw it for what it was – trade secrets of Zeeto.  Nevertheless, at the direction of Fiorentino, Tudesco contacted the clients on the list and recruited them into her network of clients at Internet Things.  In addition knowingly exploit the property of Zeeto, in recruiting and attempting to recruit these clients, Tudesco disparaged and maligned Zeeto to the clients on the list, which is forbidden under the agreements attached hereto.

104.   Further, Tudesco, in August of 2018, and while representing Zeeto at conventions, solicited Zeeto's clients for her own website she was planning on launching.  This is a direct breach of her contractual obligations with Zeeto.

105.   Plaintiffs complied with the significant terms required by the contract.

106.   Due to the actions of Tudesco, Zeeto and Tibrio have been harmed and the breach of contract was a substantial factor in causing Plaintiffs harm.

## VII.

## **REQUEST FOR JURY**

107.      Plaintiffs hereby request a jury trial in this action.

COMPLAINT

# VIII.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

1.    Damages in an amount to be proven at trial;

2.    For reasonable attorney's fees;

3.    For a preliminary injunction/temporary restraining order;

4.    For exemplary damages;

5.    For prejudgment and post judgment interest, according to proof;

6.    For costs of suit incurred herein; and,

7.    For such other and further relief as this Court deems just and proper.


Respectfully submitted,

**MORRIS LAW FIRM, APC**

Dated:  March 6, 2019                    *s/ Christopher S. Morris*
                                          Christopher S. Morris, Esq.
                                          cmorris@morrislawfirmapc.com
                                          Attorneys for Plaintiffs

COMPLAINT

# INDEX OF EXHIBITS TO COMPLAINT

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Screenshot of Conversation | 24-25 |
| 2 | Sabiha Tudesco's Employment Agreement Dated 8/17/2015 | 26-30 |
| 3 | Sabiha Tudesco's Propriety Information and Inventions Assignment Agreement  Dated 9/8/2015 | 31-41 |
| 4 | Sabiha Tudesco's Employment Offer Letter Dated 11/6/2015 | 42-45 |
| 5 | Sabiha Tudesco's Propriety Information and Inventions Assignment Agreement Dated 11/6/2016 | 46-58 |
| 6 | Sabiha Tudesco's Employment Agreement Dated 8/15/2018 | 59-62 |
| 7 | Sabiha Tudesco's Propriety Information and Inventions Assignment Agreement Dated 8/15/2018 | 63-76 |
| 8 | Sabiha Tudesco's Employment Agreement Dated 8/23/2018 | 77-78 |
| 9 | Sabiha Tudesco's Termination Certification Dated 12/13/2018 | 79-80 |

COMPLAINT

# EXHIBIT 1

Nicks, 4:22 PM

can u get a list of samples' big buyers?

4:22 PM

Heh sac



Nicks, 4:24 PM
what is that, linkout?

4:24 PM

Both

And simple opt in

Premium placement = linkout

4:25 PM

# EXHIBIT 2



925 B Street, 5th Floor
San Diego, CA  92101

August 15, 2015
Sabiha Tudesco
San Diego, CA

*Re: Terms of Employment*

Dear Sabiha,

Zeeto (the "Company") has decided to make you this offer of employment. This letter sets forth the terms of the Company's offer, which, if you accept, will govern your employment.

Position: Your position will be Director of Business Development, and you will be initially reporting to Shayne Cardwell, VP of Operations. Start date is TBD. We could be ready on our end immediately, but understand that you'll need time to transition from your current employer.

Full Time, Exempt Position: Your employment is full time and this is an exempt position, which means you are paid for the job and not by the hour. Accordingly, you will not receive overtime pay if you work more than 8 hours in a workday or forty (40) hours in a workweek.

Primary Responsibilities: While your responsibilities and duties are subject to change at the Company's discretion, the following summary sets forth your anticipated initial responsibilities:

- Develop new business by analyzing account potential; initiating, developing, and closing sales; recommending new applications and sales strategies.
- Contribute to sales strategies by evaluating current product results; identifying needs to be filled; monitoring competitive products; analyzing and relaying customer reactions.
- Utilize best practices with National Account Management planning including: account forecasting, planning and management, the selling process, the post-sales implementation process, deal economics, metrics, and sale reporting tools.

Compensation: You will be compensated as follows:

1. SALARY - $6250 per semi-month ($150,000 if annualized). Pay periods are semi-monthly on the 7th and 22nd of every month; and

2. COMMISSION – Plan is subject to change, but initially outlined as:
    a. Temporary Draw: $75,000 for the remainder of 2015. The draw reverts to $50,000 on 1/1/16 and will stay at that rate until the end of the initial 12 months.
    b. 1% of Commission Eligible Revenue (Total Monthly Paid Revenue sold less $200,000)
        i. Example: $400,000 in Total Paid Revenue less $200,000 equals $200,000 Commission Eligible Revenue times 1% Commission Rate = $2,000 Earned Commission

Page 1 of 4

    c. Bonus Tier 1: When Total Monthly Paid Revenue exceeds $500,000 an extra 0.5% is added to the Commission Rate.
        i. Example: $600,000 in Total Paid Revenue less $200,000 equals $400,000 Commission Eligible Revenue times 1.5% Commission Rate = $6,000 Earned Commission.

    d. Bonus Tier 2: When Total Monthly Paid Revenue exceeds $1,000,000 an extra 1.0% is added to the Commission Rate
        i. Example: $1,200,000 in Total Paid Revenue less $200,000 equals $1,000,000 Commission Eligible Revenue times 2.0% Commission Rate = $20,000 Earned Commission.

    e. Payment - Commission for Monthly Revenue is paid on on 1st paycheck following 30 days of closed month. Figure is based on paid invoices.
        i. Commission for August Revenue is paid on Oct 7th based on paid invoices.
        ii. Revenue from campaigns that are less than 75% of the average eCPM for that revenue source (e.g. co-reg, linkout, etc) is only eligible for commission upon management discretion since that level falls below the company's profit targets for that channel.

    f. Override - There is a potential Override that might be available should the company decide that it makes sense to have you manage some of Zeeto's house accounts. This is more likely a 2016 opportunity after we've seen some early success and would be based on growth on existing account we elect to have you manage. The rates and structure of the override, if any, will be decided at that time solely by your supervisor.

    g. The company may offer a "Sprint Bonus" from time to time based on goals and objectives. A Sprint Bonus might include something like paid travel with additional PTO days for hitting an aggressive set of shorter term goals.

3. EQUITY – Zeeto is currently drafting a share equity plan in which you will be eligible for. As it is finalized the details will be released, however it is expected to be phantom equity which would be realized during a monetization event.

4. EQUIPMENT:
    a. Company Credit Card within 60 days of start.
    b. Cell phone provided or mutually agreed upon reimbursement amount.
    c. $500 budget for shared office space.

5. TRAVEL – Expected travel of 20% - 30%

6. 14 days (equivalent of business days) of paid time off (PTO) each year, computed on a per pay period accrual basis starting at 0. You are free to use these days as you see fit for vacation time, sick leave, or observance of holidays. You may accrue up to a maximum of 112 hours of PTO. Paid time off (PTO) is to be used in accordance with the Company's policies contained in the document titled Paid Time Off Policy.

Page 2 of 4

28

7. Regular employee benefit package listed on plan documents including medical, dental, vision, life insurance, and disability effective 1st of the month following 30 days of employment. You are also eligible for 401k, FSA, paid holidays, and much more

Employment at Will: Our employment relationship is terminable *at will*, which means that either you or the Company may terminate your employment at any time and for any reason or for no reason at all. You acknowledge that irrespective of any commission-based compensation (if applicable), your employment may be terminable at will and without cause, and that all rights to receive compensation, including but not limited to commissions, shall cease immediately upon such termination. Although your job title, compensation, and benefits may change from time to time, the at-will nature of your employment shall not be changed, and this letter, along with the Proprietary Information and Inventions Agreement, sets forth the terms of your at-will employment with the Company and may not be modified or amended except by a written agreement, signed by a duly authorized executive officer of the Company and by you.

Introductory Period: Full-time and part-time employees are on an introductory period during their first 90 days of employment. During this time, you will be able to determine if your new job is suitable for you and the CEO will have an opportunity to evaluate your work performance. However, the completion of the introductory period *does not* guarantee employment for any period of time because you are an at-will employee, both during and after your introductory period.

Proprietary Information and Inventions Agreement: You will be subject to the Company's Proprietary Information and Inventions Agreement, which is enclosed with this letter and both documents must be signed and returned to us no later than your first date of employment before any employment relationship will be effective. If you need additional time for review, Management must grant an extension in writing.

Certain Acts: During your employment with the Company, you will not do anything to compete with the Company's present or contemplated business, nor will you plan or organize any competitive business activity. You will not enter into any agreement which conflicts with your duties or obligations to the Company. You will not during your employment, without the Company's express written consent, use the Company's trade secret or confidential information to directly or indirectly solicit or encourage any employee, agent, independent contractor, supplier, customer, consultant or any other person to terminate or alter a relationship with the Company.

No Inconsistent Obligations: You represent that you are aware of no obligations legal or otherwise, inconsistent with the terms of this Agreement or with your undertaking employment with the Company. You will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. You represent and warrant that you have returned all proprietary and confidential information belonging to all prior employers.

Background Check: This offer of employment is contingent upon your agreeing to submit to the Company's Background Check policy as set forth in the accompanying "Consent for Background Check." If you do not agree to the Company's Background Check policy, then this offer of employment rescinded and no employment relationship shall have been formed. Similarly, if the Company's review of the report generated by your background check reveals anything that the Company, in its sole discretion, deems inappropriate for your position, then this offer of employment rescinded and no employment relationship shall have been formed.

Page 3 of 4

Miscellaneous: This offer of employment is conditioned on a satisfactory reference and background check, and your execution of and agreement to each of the terms and conditions of the Company's Proprietary Information and Inventions Agreement, copies of which are enclosed with this letter. You will also be subject to the Company's employment policies and procedures set forth in, among other locations, the Company's Employee Handbook, which you will receive on the first day of your employment and which may be subject to period review and modification. In making this offer, we are relying upon the truthful information you have provided us about your background and experience, including any information provided us in any employment application that you may have submitted to us. This offer is conditioned on your satisfaction of all of the Company's pre-employment requirements, including but not limited to your presentation of acceptable documents establishing your eligibility to work in the United States.

Complete Agreement: Upon your acceptance, this letter will contain the entire agreement and understanding between you and the Company and supersedes any and all prior and/or contemporaneous agreements, understandings, term sheets, communications, offers, representations, warranties, or commitments by or on behalf of the Company (oral or written), other than the Proprietary Inventions and Assignment Agreement. The terms of your employment may in the future be amended, but only by a writing signed by both you and by a duly authorized executive officer of the Company.

Governing Law and Jurisdiction: The language in this letter will be construed as to its fair meaning and not strictly for or against either of us. In the event a dispute does arise, this letter, including the validity, interpretation, construction and performance of this letter, shall be governed by and construed in accordance with the substantive laws of the State of California. Jurisdiction for resolution of any disputes shall be solely in the state of California, County of San Diego.

Severability: If any provision of this letter is held invalid or unenforceable, the remainder of this letter shall nevertheless remain in full force and effect. If any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

If these terms are acceptable, please sign in the space provided below and return this letter to us. Again, we're very excited to have you join Zeeto.

Yours truly,

By: _____          8/17/15
Greg Kuchcik, HR Director              Date
Zeeto

Agreed and Accepted:

By: _____          8/17/15
Sabiha Tudesco                         Date

Page 4 of 4

# EXHIBIT 3

# PROPRIETARY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT

On this __8th__ day of __September, 2015__ (the "Effective Date"), Zeeto Media, LLC, a Delaware limited liability company located at 925 B Street, Fifth Floor, San Diego, CA 92101 ("Company"), and __Sabina Tudesco__, an individual residing at __320 9th St Jersey City NJ 07302__ ("Employee") (collectively known as the "Parties" and individually as the "Party") hereby agree as follows (the "Agreement").

## Section 1: Effective Date and "At Will" Status

1.1.    <u>Effective Date.</u> This Agreement shall become effective on the earlier of (1) commencement of Employee's employment with the Company, or (2) the date and time at which any Confidential Information (as defined in Section 2.1(a)) was or is first disclosed to Employee.

1.2.    <u>"At Will" Status.</u> This Agreement does not expressly and/or impliedly alter Employee's "at will" employment status and does not constitute an agreement relating to and/or affecting the duration of Employee's "at will" employment. The Company is an "at-will" employer, meaning that either the Company or the Employee can terminate the Employee's employment with the Company at any time and for any reason or for no reason at all.

## Section 2: Duties of Employee

2.1.    <u>Duty of Confidentiality.</u>

2.1.a.    Employee acknowledges and agrees that Employee has and will have access to and will come into contact with and learn various technical and non-technical trade secrets and other confidential information, which the Company has and will develop, compile, acquire, and own (collectively, the "Confidential Information"). Employee acknowledges and agrees that Employee is being provided access to such Confidential Information, subject to and solely based upon Employee's agreement to the covenants set forth in this Agreement and that Employee would not otherwise be afforded access to such information. Such Confidential Information includes, but is not limited to: (i) research methods, methods of compiling information, methods of creating the Company's database, procedures, devices, machines, equipment, data processing programs, software, computer models, research projects, and other means used by the Company in the conduct of its business: (ii) product formulations, strategies and plans for future business, new business, product or other development, new and innovative product ideas, potential acquisitions or divestitures, and new marketing ideas; (iii) information with respect to costs, commissions, fees, profits, sales, markets, sales methods and financial information; (iv) mailing lists, the identity of the Company's Customers (as defined below), distributors and suppliers and their names and addresses, the names of customer



PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 1 OF 10
EMPLOYEE INITIALS:
_ST_

CONFIDENTIAL
v. 3.07.2012
COMPANY INITIALS:

representatives responsible for entering into contracts for the Company's products or services, the amounts paid by such Customers to the Company, specific customer needs and requirements, and leads and referrals to prospective Customers; and (v) the structure, sequence, and organization of the Company's database, together with source code and object code; and (vi) the identity of the Company's employees, their respective salaries, bonuses, benefits, qualifications and abilities, but (with regard to this Section 2.1(a)) only to the extent that it will not restrict the Employee from discussing the Employee's wages and terms and conditions of employment with others; all of which information Employee acknowledges and agrees is not generally known or available to the general public, but has been developed, compiled or acquired by the Company at its great effort and expense. Confidential Information can be in any form: oral, written or machine readable, including electronic files. The Company has and will also have access to the confidential information of its Customers ("Customers" shall mean any and all persons and entities for whom the Company performs services and/or sells products or from whom the Company or Employee obtains information). Confidential Information shall include not only information disclosed by the Company or its Customers to Employee in the course of his or her employment, but also information developed or learned by Employee during the course of his or her employment with the Company, such as Work Product (as defined in Section 3.1).

2.1.b.    Employee agrees to treat all Confidential Information in a strictly secret and confidential manner and not to reproduce or use any of such Confidential Information without the Company's written consent.

Employee agrees that he or she will not, without the prior written consent of the Company, directly or indirectly: (i) disclose or divulge any Confidential Information to any person, entity, firm, or company; (ii) use any Confidential Information in any manner other than to perform his or her employment for the Company. Employee agrees that, given the nature of the Company's business and business plans there will never come a time when disclosure of the Confidential Information would not cause serious and irreparable harm and damage to the Company; and/or (iii) cause the transmission, removal, or transport of Confidential Information from the Company's principal place of business as set forth above.

2.1.c.    Employee agrees to provide such reasonable assistance as may be required by the Company to maintain the secrecy and confidentiality of the Confidential Information.

2.1.d.    Employee agrees that, upon termination of Employee's employment for any reason, or at any other time the Company so requests, he or she will promptly deliver to his or her supervisor all Confidential Information and all copies thereof, and all other property of the Company that are in his or her possession or control.



PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 2 OF 10
EMPLOYEE INITIALS:
ST

CONFIDENTIAL
V. 3.07.2012
COMPANY INITIALS:

2.1.e.  Employee acknowledges that in the event of a breach of this Section by Employee, the Company will suffer irreparable harm and will be entitled to injunctive relief as well as all other remedies available at law or in equity.

2.1.f.  Employee acknowledges that he or she understands that the obligations set forth in this Agreement are not intended to prevent Employee from discussing Employee's wages and/or the terms and conditions of Employee's employment with others.

2.2.  Duty of Non-Solicitation of Customers. Employee agrees that he or she will not, without the prior written consent of the Company, directly or indirectly, individually or on behalf of others, use Company's Confidential Information to solicit, divert, take away, or interfere with the Company's relationship with any and all of its customers with whom Employee had contact during his or her employment and/or regarding whom Employee obtained Confidential Information during the last two (2) years of employment with the Company. Employee acknowledges that in the event of a breach of this Section by Employee, the Company will suffer irreparable harm and will be entitled to injunctive relief, as well as all other remedies available at law or in equity.

2.3.  Duty of Non-Interference of Employees. Employee agrees that Employee will not use Company's Confidential Information, directly or indirectly, individually or on behalf of others, to raid, interfere with or otherwise disrupt the relationship between Employer and any of its employees, independent contractors or agents. Employee acknowledges that in the event of a breach of this Section by Employee, the Company will suffer irreparable harm and will be entitled to injunctive relief, as well as all other remedies available at law or in equity.

2.4.  No Derogatory Statements. Employee agrees not to make and/or publish in any manner, any derogatory or adverse statements, written or verbal, regarding the Company or its owners, directors, officers, employees, agents, affiliates, successors and/or assigns to anyone including, but not limited to the Company's (or its successor's and/or assign's) directors, officers, employees, agents, vendors, existing clients or potential clients that Employee knows that the Company has targeted.

2.5.  Duty of Non-Disclosure.

2.5.a.  Employee acknowledges and agrees that in consideration for entering into this Agreement, Employee will come into contact with, have access to and learn various technical and non-technical trade secrets, all of which are considered Confidential Information, which are the property of the Company. Employee also will receive training in the Company's proprietary business methods and practices. The Company's Confidential Information has been developed, acquired and compiled by the Company at its great effort and expense. During the term of the Employee's employment, Employee agrees that he or she shall not directly and/or indirectly compete with or assist others to compete with Company. Employee acknowledges, agrees and understands that the Company is relying upon this covenant not to compete in providing Employee access to its trade secrets and other Confidential



PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 3 OF 10
EMPLOYEE INITIALS:

CONFIDENTIAL
v. 3.07.2012
COMPANY INITIALS:

Information and will not provide Employee access to this information but for Employee's agreement to this covenant.

2.5.b.  Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that by virtue of Employee's position and responsibilities with the Company and Employee's access to the Confidential Information, engaging in any business that is competitive with the Company will cause the Company great and irreparable harm.

2.5.c.  Employee agrees that the Company may notify any person or entity employing Employee or evidencing an intention to employ Employee as to the existence and terms of this Agreement.

## Section 3: Employee Work Product

3.1.  Disclosure of Work Product. Employee shall promptly and fully disclose to his or her supervisor any and all ideas, inventions, discoveries, developments, designs, techniques, improvements, plans, works of authorship, computer software, data information, enhancements, or other work product, whether tangible or intangible, developed by Employee, solely or jointly with others, during Employee's employment with the Company (1) made with the Company's equipment, supplies, facilities, trade secrets, or time; or (2) that relate, at the time of conception or reduction to practice to the Company's business, or the Company's actual or demonstrably anticipated research; or (3) result from any work performed by Employee for the Company (collectively the "Work Product").

3.2.  Ownership of Work Product. All Work Product shall be conclusively deemed to be conceived, made, developed, authored, reduced to practice, prepared, or otherwise created within the scope of Employee's employment and shall be the sole property of the Company. Employee hereby irrevocably assigns and transfers to the Company all right, title, and interest of whatever nature that Employee may have in the Work Product to the extent it is not a considered a "work for hire."

3.3.  Employee's Obligations. Employee shall, at the expense and on behalf of the Company, do all acts and things requested by the Company for the Company to obtain, establish, preserve, and protect the Company's rights and interests in the Work Product, including, but not limited to, preparing and signing such applications, papers, instruments, and other documents as the Company may deem necessary for it, or its nominee, to obtain and maintain patents, copyrights, trade secrets, trademarks, and service markings within the United States, or elsewhere, or both. Employee's obligations under this Section of this Agreement shall be in effect at all times while Employee is employed by the Company and for five years after Employee's termination of employment with the Company.

3.4.  Power of Attorney. In the event the Company is unable to secure Employee's signature on any document necessary to apply for, prosecute, obtain, or enforce any patent, copyright, trademark, or other right or protection relating to any Work Product, whether due to mental or physical incapacity or any other cause, Employee hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as his or her agent

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 4 OF 10
EMPLOYEE INITIALS:



CONFIDENTIAL
v. 3.07.2012
COMPANY INITIALS:

35

and attorney-in-fact, to act for and in his or her behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of patents, copyrights, or other rights or protections with the same force and effect as if executed and delivered by the Employee.

3.5.   Exceptions. Notwithstanding any provision of this Section 3, Employee shall not be required to assign, nor shall he or she be deemed to have assigned, any of Employee's rights in any inventions, as set forth in Labor Code §2870 (reprinted in its entirety on Exhibit A to this Agreement), that Employee develops entirely on his or her own time without using Company's equipment, supplies, facilities, or Trade Secrets, except for inventions that either (1) relate, at the time that the invention is conceived or reduced to practice, to Company's business or to actual or demonstrably anticipated research or development of Company or (2) result from any work performed by Employee for Company.

## Section 4: Prior Knowledge and Relationships

4.1.   Prior Knowledge and Inventions. Except as disclosed on Exhibit B to this Agreement, Employee does not know anything about the Company's Confidential Information, other than the information he or she has learned from the Company. Employee has also disclosed on Exhibit "B" a complete list of all inventions proprietary to Employee and which Employee wants to exclude from the application of this Agreement. The Company agrees to receive and hold all such disclosures in confidence.

4.2.   Prior Commitments. Employee has no other agreements, relationships, or commitments to any other person or entity that conflict with Employee's obligations to the Company under this Agreement.

4.3.   Proprietary Information and Trade Secrets of Others. Employee will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that he or she has returned all property and confidential information belonging to all prior employers.

## Section 5: Return of Company Information

5.1.   Return of Company's Information. Upon termination (voluntary or otherwise) of Employee's employment with the Company, Employee agrees that Employee shall immediately deliver to and inform the Company of all documents and data pertaining to his or her employment and the Confidential Information and Work Product of the Company and/or its Customers, whether prepared by Employee or otherwise coming into his or her possession or control. Upon Employee's termination (voluntary or otherwise), Employee shall also complete, sign and return to the Company Exhibit C of this Agreement. Employee will not retain any written or other tangible material containing any information concerning or disclosing any of the Confidential Information or Work Product of the Company or its Customers. Employee recognizes that the unauthorized taking of any of the Company's Confidential Information may be punishable as a crime. Employee acknowledges that knowingly accessing and extracting data from a computer system without authorization may be a crime, and that unauthorized taking of the Company's trade secrets could result in civil

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 5 OF 10
EMPLOYEE INITIALS:



CONFIDENTIAL
V. 3.07.2012
COMPANY INITIALS:

36

liability, and that wilful misappropriation may result in an award against Employee for triple the amount of the Company's damages and the Company's attorney's fees in collecting such damages.

### Section 6: Use of Employee's Name and Image

6.1   Company shall have the right to use the name, voice, photograph, or likeliness of Employee should it deem these uses advisable, and Employee gives his or her consent to these uses for so long as the Company deems advisable. If Company chooses to use Employee's name or image in any trade name or trademark adopted during the term of employment, Employee agrees that he or she shall not permit, either during the term of this Agreement or at any time thereafter, the use of his or her name in the trade name or trademark of any other enterprise if that enterprise is engaged in a business similar in any respect to that conducted by Company, unless that trade name or trademark clearly indicates that the other enterprise is a separate and distinct entity and not to be confused with Company, and does not in any way incorrectly suggest a prior or current affiliation or connection with Company or its employees.

### Section 7: Miscellaneous

7.1.   Modification of Agreement. This Agreement may be modified only upon the written consent of both Employee and the Company.

7.2.   Entire Agreement. This Agreement constitutes the entire agreement between the parties. There are no agreements, understandings, restrictions, warranties, or representations between the parties relating to this subject matter other than those in this Agreement.

7.3.   Separability. If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect. The parties agree that any ambiguity set forth in this Agreement shall not be interpreted against the Company and that this Agreement shall be deemed drafted by both Employee and Company.

7.4.   Governing Law. This Agreement shall be governed by the laws of California, without reference to its conflicts of law provisions.

7.5.   Survival. Employee agrees that the provisions contained in this Agreement shall survive any termination of Employee's employment with the Company.

7.6.   Assignment and Successors. Employee agrees that the terms of this Agreement shall inure to the benefit of and may be enforced by the Company and the Company's successors or assigns. Employee agrees that the terms of this Agreement shall be binding upon him or her and his or her executors, administrators, legatees, distributees, and other successors in interest.

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 6 OF 10
EMPLOYEE INITIALS:



CONFIDENTIAL
v. 3.07.2012
COMPANY INITIALS:

37

7.7.   Payment of Costs and Attorneys Fees. A party who breaches the terms of this Agreement shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees incurred in enforcing the terms of the Agreement.

7.8.   Opportunity for Review by Employee's Outside Counsel. Employee acknowledges that he or she has read this Agreement in its entirety, and has had ample opportunity to have legal and financial counsel review the Agreement, explain its provisions, and provide appropriate advice.

7.9.   Waiver of Breach. The waiver by either party of a breach of any provisions of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach. A delay or failure by either party to exercise a right under this Agreement, or a partial or single exercise of that right, shall not constitute a waiver of that or any other right.

7.10.  Counterparts. This Agreement, for the convenience of the parties, may be executed in any number of counterparts, all of which when taken together shall constitute one and the same Agreement.

7.11.  Notices. All notices given hereunder will be in writing, delivered personally or mailed by registered or certified mail, return receipt requested, or delivered by well-recognized overnight mail. If such notice is being delivered to the Employee such notice shall delivered to the address specified at the top of this Agreement, and if being delivered to the Company, delivered to Zeeto Media, LLC, 925 B Street, Fifth Floor, San Diego, CA 92101, attn: Stephan Goss, or to such other address as either party may specify to the other from time to time. All notices will be deemed given if delivered personally, on the day of delivery, if mailed by registered or certified mail, three days after the date of mailing, and if delivered by overnight mail, one day after mailing.

EMPLOYEE ACKNOWLEDGES THAT THIS AGREEMENT AFFECTS EMPLOYEE'S RIGHTS TO INVENTIONS THAT EMPLOYEE DEVELOPS AND/OR CONCEIVES DURING HIS OR HER EMPLOYMENT, AND ADDITIONALLY RESTRICTS EMPLOYEE'S RIGHT TO DISCLOSE OR USE THE COMPANY'S CONFIDENTIAL INFORMATION DURING OR SUBSEQUENT TO EMPLOYEE'S EMPLOYMENT.

EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS. EMPLOYEE HAS COMPLETELY FILLED OUT EXHIBIT B TO THIS AGREEMENT AND HAS RECEIVED A COPY OF THIS WRITTEN NOTIFICATION.

ZEETO MEDIA

BY (SIGNATURE): _____
STEPHAN GOSS, CEO

EMPLOYEE

BY (SIGNATURE): _____
PRINT NAME: Sabina Tudesco

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 7 OF 10
EMPLOYEE INITIALS: _____

CONFIDENTIAL
v. 3.07.2012
COMPANY INITIALS: _____

## Exhibit A.  Company's Written Notification To Employee Of California Labor Code §2870

In accordance with California Labor Code §2870, you are hereby notified that this Agreement does not require you to assign to Company any invention for which no equipment, supplies, facility, or trade secrets of Company was used, that was developed entirely on your own time, and that does not relate to the business of Company or to Company's actual or demonstrably anticipated research or development or does not result from any work performed by you for Company. The following is the text of California Labor Code §2870:

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

I hereby acknowledge receipt of this written notification.

Dated: _9|8|15_

Sign: _____

Print: _Sabiha Tudesco_

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 8 OF 10
EMPLOYEE INITIALS:

CONFIDENTIAL
V. 3.07.2012
COMPANY INITIALS:

39

### Exhibit B.  Employee Statement

1.  Confidential Information. Except as detailed below, I hereby confirm that to the best of my knowledge I am currently unaware of any information pertaining to the business or Confidential Information or Work Product of the Company or its Customers, except what has been disclosed by the Company or its Clients directly to me [specify such information; if none, so state]

_____

_____

2.  Prior Inventions. Except as detailed below, I hereby confirm that to the best of my knowledge, either personally or with others, I have not made or reduced to practice any inventions [specify inventions; if none, so state]

_____

_____

3.  Conflicting Relationships. Except as detailed below, I hereby confirm that to the best of my knowledge, I do not have any current or prior commitments, agreements, or relationships that would present a conflict with my relationship with the Company under my Proprietary Information and Invention Assignment Agreement [specify conflicts; if none, so state]

_____

_____

Dated: ___9/8/15___

Sign: _____

Print: _Sabina Tudosco_

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 9 OF 10
EMPLOYEE INITIALS:
ST

CONFIDENTIAL
v. 3.07.2012
COMPANY INITIALS:
SS

## Exhibit C. Termination Certification

I hereby certify that to the best of my knowledge, I do not possess any Confidential Information, either in original or photocopied form, or other such documents, materials, equipment, or property under the ownership of the Company or its Customers.

I hereby further certify that to the best of my knowledge, I have been and will continue to be in compliance with each and every term outlined in the Invention Assignment and Non-Disclosure Agreement which bears my signature, including the reporting of any and all Work Product I conceived or made that are covered by that Agreement.

I hereby further certify that I will remain in compliance with the Proprietary Information and Invention Assignment Agreement by preserving as confidential all Confidential Information, Work Product, or other information with commercial value or other utility in the business in which the Company or its Customers are potentially engaged. I will not disclose unauthorized information that could be detrimental or harmful to the interests of the Company or its Customers, whether such information is identified by the Company or its Customers as confidential or not.

Upon termination of my employment with the Company, my employment will be with _____ in _____ Division and my work will be in connection with the following projects [describe projects briefly]:

_____

_____

Dated: _____

Sign: _____

Print: _____

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT
PAGE 10 OF 10
EMPLOYEE INITIALS: _____



CONFIDENTIAL
V. 3.07.2012
COMPANY INITIALS:

# EXHIBIT 4

**zeeto**

925 B Street, 5th Floor
San Diego, CA 92101

11/1/2015
Sabiha Tudesco
San Diego, CA

*Re: Terms of Employment*

Dear Sabiha,

Zeeto (the "Company") has decided to make you this offer of employment. This letter sets forth the terms of the Company's offer, which, if you accept, will govern your employment.

<u>Position:</u> Your position is Director of Sales/BD, and you will be initially reporting to Shayne Cardwell, VP of Operations.

<u>Full Time, Exempt Position:</u> Your employment is full time and your position is EXEMPT, which means you will be paid based on an annual salary rather than by the hour and you will not receive overtime pay if you work more than 8 hours in a workday or 40 hours in a workweek.

<u>Compensation:</u> You will be compensated as follows:

1. $6,250 twice per month ($150k annually). Pay periods are semi-monthly on the 7th and 22nd of every month.

2. Unlimited Paid Time Off (PTO). PTO is to be used in accordance with the Company's Paid Time Off Policy.

3. Paid sick leave in the amount of 80 hours (10 days) per year, starting at 0 and accruing 3.34 hours per pay period. The maximum sick accrual at any point is 160 hours (20 days). Sick time is to be used in accordance with the Company's Paid Sick Time Policy.

4. An employee benefit package, including for example medical, dental, vision, life insurance, and disability. Details are included in the plan documents. You will also be eligible for 401k, FSA, paid holidays, and much more.

5. Commission terms remain unchanged as of initial offer letter.

<u>Employment at Will:</u> Our employment relationship is terminable *at will*, which means that either you or the Company may terminate your employment at any time and for any reason or for no reason at all. You acknowledge that irrespective of any commission-based compensation (if applicable), your employment may be terminable at will and without cause, and that all rights to receive compensation, including but not limited to commissions, shall cease immediately upon such termination. Although your job title, compensation, and benefits may change from time to time, the at-will nature of your employment shall not change, and this letter, along with the Proprietary Information and Inventions Agreement, sets forth the terms of your at-will employment with the Company and may not be modified or amended except by a written agreement, signed by a duly authorized executive officer of the Company and by you.

---

Page 1 of 3

Proprietary Information and Inventions Agreement: You will be subject to the Company's Proprietary Information and Inventions Agreement, which is enclosed with this letter. It must be signed and returned to us no later than your first date of employment before any employment relationship will be effective. If you need additional time for review, you must obtain an extension from Management in writing.

Certain Acts: During your employment with the Company, you will not do anything to compete with the Company's present or contemplated business, nor will you plan or organize any competitive business activity. You will not enter into any agreement that conflicts with your duties or obligations to the Company. You will not during your employment, without the Company's express written consent, use the Company's trade secret or confidential information to directly or indirectly solicit or encourage any employee, agent, independent contractor, supplier, customer, consultant, or any other person to terminate or alter a relationship with the Company.

No Inconsistent Obligations: You represent that you are aware of no obligations legal or otherwise, inconsistent with the terms of this Agreement or with your undertaking employment with the Company. You will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. You represent and warrant that you have returned all proprietary and confidential information belonging to all prior employers.

Background Check: This offer of employment is contingent upon your agreeing to submit to the Company's Background Check policy as set forth in the accompanying "Consent for Background Check." If you do not agree to the Background Check policy, then this offer of employment will be rescinded and no employment relationship shall have been formed. Similarly, if the Company's review of the report generated by your background check reveals anything that the Company, in its sole discretion, deems inappropriate for your position, then this offer of employment will be rescinded and no employment relationship shall have been formed.

Miscellaneous: You will also be subject to the Company's employment policies and procedures set forth in, among other locations, the Company's Employee Handbook, which you will receive on the first day of your employment and which may be subject to periodic review and modification. In making this offer, we are relying upon the truthful information you have provided us about your background and experience, including any information provided in any employment application that you may have submitted to us. This offer is conditioned on your satisfaction of all of the Company's pre-employment requirements, including but not limited to your presentation of acceptable documents establishing your eligibility to work in the United States.

Complete Agreement: Upon your acceptance, this letter will contain the entire agreement and understanding between you and the Company and supersedes any and all prior and/or contemporaneous agreements, understandings, term sheets, communications, offers, representations, warranties, or commitments by or on behalf of the Company (oral or written), other than the Proprietary Inventions and Assignment Agreement. The terms of your employment may in the future be amended, but only by a writing signed by both you and by a duly authorized executive officer of the Company.

Governing Law and Jurisdiction: The language in this letter will be construed as to its fair meaning and not strictly for or against either of us. In the event a dispute does arise, this letter, including the validity, interpretation, construction, and performance of this letter, shall be governed by and construed in accordance with the substantive laws of the State of California. Jurisdiction for resolution of any disputes shall be solely in the state of California, County of San Diego.

Page 2 of 3

Severability: If any provision of this letter is held invalid or unenforceable, the remainder of this letter shall nevertheless remain in full force and effect. If any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

No Interference. While Employee is employed by Zeeto and for a period of one year after Employee ceases to be employed by Zeeto, Employee shall not attempt to employ, or solicit for employment by Employee or any third party, any individual who is then employed by Zeeto or who was employed by Zeeto during the 12 months immediately preceding.

If these terms are acceptable, please sign in the space provided below and return this letter to us. Again, we're very excited to have you join Zeeto

Yours truly,

By: _____    10-27-15

    Greg Kuchcik, HR Director        Date
    Zeeto

Agreed and Accepted:

By: _____    11-6-15

    Sabiha Tudesco            Date

# EXHIBIT 5

# PROPRIETARY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT

This Proprietary Information and Inventions Agreement (the "Agreement") is entered into by and between ZeetoGroup, LLC (the "Employer" or "Company"), a Delaware limited liability company located at 925 B Street, Fifth Floor, San Diego, CA 92101 and _Sabiha Tudisco_____, an individual (the "Employee") (collectively referred to herein as the "Parties") as of ___11|6|15_____ (the "Effective Date").

In consideration of the Employee's employment by Company, which the Employee acknowledges to be good and valuable consideration for the Employee's obligations hereunder, the Parties hereby agree as follows:

## Section 1: Effective Date and "At Will" Status

1.1.   Effective Date. This Agreement shall become effective on the earlier of (1) commencement of Employee's employment with the Company, or (2) the date and time at which any Confidential Information (as defined in Section 2.1(a)) was or is first disclosed to Employee.

1.2.   "At Will" Status. The Employee understands and acknowledges that the Employee shall remain an "at will" employee, this Agreement does not alter Employee's "at will" employment status, and this Agreement does not constitute an agreement relating to and/or affecting the duration of Employee's "at will" employment. The Company is an "at-will" employer, meaning that either the Company or the Employee can terminate the Employee's employment with the Company at any time and for any reason or for no reason at all.

## Section 2: Duties of Employee

2.1.   Duty of Confidentiality.

a.   Employee understands and acknowledges that during the course of employment by Company, Employee has and will have access to and come into contact with confidential, secret, and proprietary documents, materials, and other confidential information, in tangible and intangible form, of and relating to the Company ("Confidential Information"). Employee acknowledges and agrees that Employee is being provided access to such Confidential Information, subject to and solely based upon Employee's agreement to the covenants set forth in this Agreement and that Employee would not otherwise be afforded access to such information. Employee further understands and acknowledges that the Confidential Information and Company's ability to reserve it for exclusive knowledge and use for Company is highly important and of great value to Company, so much that improper use or disclosure of the Confidential Information would likely cause the Company irreparable harm, including financial costs, loss of business advantage, liability under agreements with third parties, civil damages, and criminal penalties.

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 1 OF 12

CONFIDENTIAL
v. 10.13.2015

Such Confidential Information includes, but is not limited to:

(i)      Business processes, business practices, policies, plans, know-how, work-in-process, procedures, research methods, methods of compiling information, methods of creating the Company's systems and database, procedures, devices, machines, equipment, data processing programs, software, computer models, research projects, and other means used by the Company in the conduct of its business;

(ii)     Advertising and marketing design, advertising compilations, advertising information, negotiation strategies, design information, strategic elements to advertisements, marketing strategies, creative assets, traffic strategy, results from testing; results from reports; creative designs, media buy strategy;

(iii)    Algorithms, formulae, notes, reports, developments, records, research papers, operating systems, software design, web design, databases, code, models, experimental processes, inventions, experimental results, security procedures, studies, documents, and analysis

(iv)     Strategies and plans for future business product formulations, potential transactions, marketing plans, pending negotiations, new business, product or other development, new and innovative product ideas, potential acquisitions or divestitures, and new marketing ideas;

(v)      Information with respect to costs, commissions, fees, profits, sales, markets, revenue, pricing strategies, accounting information, accounting records, credit information, sales information, bidding techniques, sales methods and financial information; m

(vi)     Metrics, mailing lists, the identity of the Company's Customers (as defined below), distributors and suppliers and their names and addresses, the names of customer representatives responsible for entering into contracts for the Company's products or services, the amounts paid by such Customers to the Company, customer lists, client information, specific customer needs and requirements, and leads and referrals to prospective Customers;

(vii)    The structure, sequence, and organization of the Company's database, together with source code and object code; and

(viii)   The identity of the Company's employees, their respective salaries, bonuses, benefits, qualifications and abilities, but (with regard to this Section 2.1(a)) only to the extent that it will not restrict the Employee from discussing the Employee's wages and terms and conditions of employment with others; all of which information Employee acknowledges and agrees is not generally known or available to the general public, but has been developed, compiled or acquired by the Company at its great effort and expense.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 2 OF 12

CONFIDENTIAL
v. 10.13.2015

48

otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Confidential Information can be in any form: oral, written or machine readable, including electronic files. The Company has and will also have access to the confidential information of its Customers ("Customers" shall mean any and all persons and entities for whom the Company performs services and/or sells products or from whom the Company or Employee obtains information). Confidential Information shall include not only information disclosed by the Company or its Customers to Employee in the course of his or her employment, but also information developed or learned by Employee during the course of his or her employment with the Company, such as Work Product (as defined in Section 3.1).

b.    Employee agrees to treat all Confidential Information in a strictly secret and confidential manner and not to reproduce or use any of such Confidential Information without the Company's written consent.

Employee agrees that he or she will not, without the prior written consent of the Company, directly or indirectly: (i) disclose, publish, communicate, or divulge any Confidential Information to any person, entity, firm, or company; (ii) use any Confidential Information in any manner other than to perform his or her employment for the Company; and/or (iii) cause the transmission, removal, or transport of Confidential Information from the Company's principal place of business as set forth above.  Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to a valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order.  The Employee shall promptly provide written notice of any such order to the Legal Department or the Human Resources Department within five business days of receiving such order.

c.    Employee agrees to provide such reasonable assistance as may be required by the Company to maintain the secrecy and confidentiality of the Confidential Information.

d.    Employee agrees that, upon termination of Employee's employment for any reason, or at any other time the Company so requests, he or she will promptly deliver to his or her supervisor all Confidential Information and all copies thereof, and all other property of the Company that are in his or her possession or control. Employee understands and acknowledges that his or her obligations under this Agreement shall continue even after termination of employment with Employer until such time as any such Confidential Information has become public knowledge other than as a result of Employee's breach of this Agreement.

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 3 OF 12

CONFIDENTIAL
v. 10.13.2015

49

e.   Employee acknowledges that in the event of a breach of this Section by Employee, the Company will suffer irreparable harm and will be entitled to injunctive relief as well as all other remedies available at law or in equity.

f.   Employee acknowledges that he or she understands that the obligations set forth in this Agreement are not intended to prevent Employee from discussing Employee's wages and/or the terms and conditions of Employee's employment with others.

2.2.   Duty of Non-Solicitation of Customers. Employee agrees that he or she will not, without the prior written consent of the Company, directly or indirectly, individually or on behalf of others, use Company's Confidential Information to solicit, divert, take away, or interfere with the Company's relationship with any and all of its customers with whom Employee had contact during his or her employment and/or regarding whom Employee obtained Confidential Information during the last two (2) years of employment with the Company. Employee acknowledges that in the event of a breach of this Section by Employee, the Company will suffer irreparable harm and will be entitled to injunctive relief, as well as all other remedies available at law or in equity.

2.3.   Duty of Non-Interference of Employees. Employee agrees that Employee will not use Company's Confidential Information, directly or indirectly, individually or on behalf of others, to raid, interfere with or otherwise disrupt the relationship between Employer and any of its employees, independent contractors or agents. Employee acknowledges that in the event of a breach of this Section by Employee, the Company will suffer irreparable harm and will be entitled to injunctive relief, as well as all other remedies available at law or in equity.

2.4.   No Derogatory Statements. Employee agrees not to make and/or publish in any manner, any derogatory or adverse statements, written or verbal, regarding the Company or its owners, directors, officers, employees, agents, affiliates, successors and/or assigns to anyone including, but not limited to the Company's (or its successor's and/or assign's) directors, officers, employees, agents, vendors, existing clients or potential clients that Employee knows that the Company has targeted.

2.5.   Duty of Non-Disclosure.

a.   Employee acknowledges and agrees that in consideration for entering into this Agreement, Employee will come into contact with, have access to and learn various technical and non-technical trade secrets, all of which are considered Confidential Information, which are the property of the Company. Employee also will receive training in the Company's proprietary business methods and practices. The Company's Confidential Information has been developed, acquired and compiled by the Company at its great effort and expense. During the term of the Employee's employment, Employee agrees that he or she shall not directly and/or indirectly compete with or assist others to compete with Company. Employee acknowledges, agrees and understands that the Company is relying upon this covenant not to compete in providing Employee access to its trade

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



CONFIDENTIAL
v. 10.13.2015

PAGE 4 OF 12

secrets and other Confidential Information and will not provide Employee access to this information but for Employee's agreement to this covenant.

b.  Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that by virtue of Employee's position and responsibilities with the Company and Employee's access to the Confidential Information, engaging in any business that is competitive with the Company will cause the Company great and irreparable harm.

c.  Employee agrees that the Company may notify any person or entity employing Employee or evidencing an intention to employ Employee as to the existence and terms of this Agreement.

## Section 3: Inventions

3.1.  <u>Disclosure of Inventions</u>.  Employee acknowledges and agrees that during his or her employment with Company, the Employee may be in a position that could provide the opportunity for conceiving certain inventions, improvements, developments, ideas, or discoveries (collectively, **"Inventions"**).  Inventions include, but are not limited to, ideas, inventions, discoveries, developments, plans, publications, research, strategies, techniques, agreements, documents, contracts, techniques, improvements, enhancements, agreement terms, know-how, computer programs, software design, web design, work in process, works of authorship, databases, results, reports, graphics, designs, drawings, algorithms, product plans, product designs, models, inventions, unpublished patent applications, original work of authorship, discoveries, experimental processes, marketing information, advertising information, and any other work product, whether tangible or intangible, developed by Employee, solely or jointly with others, during Employee's employment with Company that: (i) was made with Company's equipment, supplies, facilities, trade secrets, or time; (ii) that relate, at the time of conception or reduction to practice to Company's business or the Company's anticipated or demonstrably anticipated research; or (iii) result from any work performed by Employee for Company.

Accordingly, the Employee agrees to promptly disclose to Company in confidence any and all Inventions that Employee may have solely or jointly conceived or reduced to practice while employed by Company.

3.2  <u>Assignment of Inventions</u>.  Employee hereby assigns to Company all rights, title, and interest in and to any and all Inventions that Employee may have solely or jointly conceived, developed or reduced to practice while employed by Company.  Employee further acknowledge that all Inventions within the scope of and during employment with Company are "works for hire" under U.S. copyright law, and regardless of whether works are made for hire, Company shall exclusively own all rights, titles, interests and licenses to such Inventions.

3.3  <u>Employee's Obligations</u>.  Employee agrees to cooperate with Company in executing the necessary documents to assign such Inventions to Company, if necessary.  Employee shall, at the expense and on behalf of Company, cooperate with and do all acts and things

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 5 OF 12

CONFIDENTIAL
v. 10.13.2015

51

requested by Company to obtain, establish, preserve, and protect Employer's rights and interested in the Inventions, including, but not limited to, preparing and signing such applications, papers, instruments, and other documents as the Company may deem necessary for it to obtain and maintain patents, copyrights, trade secrets, trademarks, and service marks within the United States, or elsewhere, or both. Employee's obligations under this Section of this Agreement shall be in effect at all times while Employee us employed by Company and for five years after Employee's termination of employment with Company.

3.4.   Power of Attorney. In the event the Company is unable to secure Employee's signature on any document necessary to apply for, prosecute, obtain, or enforce any patent, copyright, trademark, or other right or protection relating to any Work Product, whether due to mental or physical incapacity or any other cause, Employee hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as his or her agent and attorney-in-fact, to act for and in his or her behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of patents, copyrights, or other rights or protections with the same force and effect as if executed and delivered by the Employee.

3.5.   Exceptions. Notwithstanding any provision of this Section 3, Employee shall not be required to assign, nor shall he or she be deemed to have assigned, any of Employee's rights in any inventions, as set forth in Labor Code §2870 (reprinted in its entirety on Exhibit A to this Agreement), that Employee develops entirely on his or her own time without using Company's equipment, supplies, facilities, or Trade Secrets, except for inventions that either (1) relate, at the time that the invention is conceived or reduced to practice, to Company's business or to actual or demonstrably anticipated research or development of Company or (2) result from any work performed by Employee for Company.

## Section 4: Prior Knowledge and Relationships

4.1.   Prior Knowledge and Inventions. Except as disclosed on Exhibit B to this Agreement, Employee does not know anything about the Company's Confidential Information, other than the information he or she has learned from the Company. Employee has also disclosed on Exhibit "B" a complete list of all inventions proprietary to Employee and which Employee wants to exclude from the application of this Agreement. The Company agrees to receive and hold all such disclosures in confidence.

4.2.   Prior Commitments. Employee has no other agreements, relationships, or commitments to any other person or entity that conflict with Employee's obligations to the Company under this Agreement.

4.3.   Proprietary Information and Trade Secrets of Others. Employee will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that he or she has returned all property and confidential information belonging to all prior employers.

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 6 OF 12

CONFIDENTIAL
v. 10.13.2015

52

## Section 5: Security

5.1.    Security Access. Employee agrees to the following:

    a.  To comply with all Company security policies and procedures as in force from time in time, including, but not limited to, those regarding computer equipment, facilities access, key cards, access codes, social media and instant messaging systems, computer systems e-mail systems, compute networks, data security, passwords, document storage systems, and any and all other Company facilities and communication technologies ("Facilities and Access Resources");

    b.  Not to access or use any Facilities and Access Resources, except as authorized by Company;

    c.  Not to access or use any Facilities and Access Resources in any manner following termination of employment with Company, whether termination is voluntary or involuntary.

Employee agrees to notify Company promptly in the event Employee learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized use, reproduction, or reverse engineering or tampering with any Facilities and Access Resources.

5.2.    Return of Company's Information. Upon termination (voluntary or otherwise) of Employee's employment with the Company, Employee shall immediately deliver and return to Company any and all Company property, including all documents and data pertaining to his or her employment and the Confidential Information and Work Product of the Company and/or its Customers, whether prepared by Employee or otherwise coming into his or her possession or control. Upon Employee's termination (voluntary or otherwise), Employee shall also complete, sign and return to the Company Exhibit C of this Agreement. Employee will not retain any written or other tangible material containing any information concerning or disclosing any of the Confidential Information or Work Product of the Company or its Customers. Further, Employee shall delete or destroy all copies of any such Confidential Information and/or Work Product that remain in Employee's possession or control, including those stored on any non-Company devices, networks, storage locations. Employee recognizes that the unauthorized taking of any of the Company's Confidential Information may be punishable as a crime. Employee acknowledges that knowingly accessing and extracting data from a computer system without authorization may be a crime, and that unauthorized taking of the Company's trade secrets could result in civil liability, and that wilful misappropriation may result in an award against Employee for triple the amount of the Company's damages and the Company's attorney's fees in collecting such damages.

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 7 OF 12

CONFIDENTIAL
V. 10.13.2015

53

### Section 6: Use of Employee's Name and Image

6.1    Company shall have the right to use the name, voice, photograph, or likeliness of Employee should it deem these uses advisable, and Employee gives his or her consent to these uses for so long as the Company deems advisable for all legitimate business purposes of Company. If Company chooses to use Employee's name or image in any trade name or trademark adopted during the term of employment, Employee agrees that he or she shall not permit, either during the term of this Agreement or at any time thereafter, the use of his or her name in the trade name or trademark of any other enterprise if that enterprise is engaged in a business similar in any respect to that conducted by Company, unless that trade name or trademark clearly indicates that the other enterprise is a separate and distinct entity and not to be confused with Company, and does not in any way incorrectly suggest a prior or current affiliation or connection with Company or its employees. Employee hereby forever releases Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after Employee's employment with Company in connection with Company's use of Employee's name, voice, photograph, or likeness.

### Section 7: Miscellaneous

7.1.    <u>Modification of Agreement.</u> This Agreement may be modified only upon the written consent of both Employee and the Company.

7.2.    <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between the parties. There are no agreements, understandings, restrictions, warranties, or representations between the parties relating to this subject matter other than those in this Agreement.

7.3.    <u>Severability.</u> If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect. The parties agree that any ambiguity set forth in this Agreement shall not be interpreted against the Company and that this Agreement shall be deemed drafted by both Employee and Company.

7.4.    <u>Governing Law; Jurisdiction and Venue.</u> This Agreement shall be governed by the laws of California, without reference to its conflicts of law provisions. Any action or proceeding by either party to enforce this Agreement shall be brought in any state or federal court located in the county of San Diego. The parties hereby irrevocably submit to the exclusive jurisdiction if San Diego courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

7.5.    <u>Survival.</u> Employee agrees that the provisions contained in this Agreement shall survive any termination of Employee's employment with the Company.

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 8 OF 12

CONFIDENTIAL
v. 10.13.2015

7.6.    Assignment and Successors. Employee agrees that the terms of this Agreement shall inure to the benefit of and may be enforced by the Company and the Company's successors or assigns. Employee agrees that the terms of this Agreement shall be binding upon him or her and his or her executors, administrators, legatees, distributees, and other successors in interest.

7.7.    Payment of Costs and Attorneys Fees. A party who breaches the terms of this Agreement shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees incurred in enforcing the terms of the Agreement.

7.8.    Opportunity for Review. Employee acknowledges that he or she has read this Agreement in its entirety, and has had ample opportunity to have legal and financial counsel review the Agreement, explain its provisions, and provide appropriate advice.

7.9.    Waiver of Breach. The waiver by either party of a breach of any provisions of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach. A delay or failure by either party to exercise a right under this Agreement, or a partial or single exercise of that right, shall not constitute a waiver of that or any other right.

7.10.   Counterparts. This Agreement, for the convenience of the parties, may be executed in any number of counterparts, all of which when taken together shall constitute one and the same Agreement.

EMPLOYEE ACKNOWLEDGES THAT THIS AGREEMENT AFFECTS EMPLOYEE'S RIGHTS TO INVENTIONS THAT EMPLOYEE DEVELOPS AND/OR CONCEIVES DURING HIS OR HER EMPLOYMENT, AND ADDITIONALY RESTRICTS EMPLOYEE'S RIGHT TO DISCLOSE OR USE THE COMPANY'S CONFIDENTIAL INFORMATION DURING OR SUBSEQUENT TO EMPLOYEE'S EMPLOYMENT.

EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS. EMPLOYEE HAS COMPLETELY FILLED OUT EXHIBIT B TO THIS AGREEMENT AND HAS RECEIVED A COPY OF THIS WRITTEN NOTIFICATION.

ZEETOGROUP, LLC

BY (SIGNATURE): _____
                    _____
STEPHAN GOSS, CEO

EMPLOYEE

BY (SIGNATURE): _____

PRINT NAME  Sabiha Tudesco

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT



PAGE 9 OF 12

CONFIDENTIAL
V. 10.13.2015

55

## <u>Exhibit A. Company's Written Notification To Employee Of</u>
## <u>California Labor Code §2870</u>

In accordance with California Labor Code §2870, you are hereby notified that this Agreement does not require you to assign to Company any invention for which no equipment, supplies, facility, or trade secrets of Company was used, that was developed entirely on your own time, and that does not relate to the business of Company or to Company's actual or demonstrably anticipated research or development or does not result from any work performed by you for Company. The following is the text of California Labor Code §2870:

    (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

        (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

        (2) Result from any work performed by the employee for the employer.

    (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

I hereby acknowledge receipt of this written notification.

Dated: _1/6/15_



By: Sabiha Tudesco

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT

PAGE 10 OF 12

CONFIDENTIAL
v. 10.13.2015

56

## Exhibit B.  Employee Statement

1.  Confidential Information. Except as detailed below, I hereby confirm that to the best of my knowledge I am currently unaware of any information pertaining to the business or Confidential Information or Work Product of the Company or its Customers, except what has been disclosed by the Company or its Clients directly to me [specify such information; if none, so state]

    *none*

2.  Prior Inventions. Except as detailed below, I hereby confirm that to the best of my knowledge, either personally or with others, I have not made or reduced to practice any inventions [specify inventions; if none, so state]

    *none*

3.  Conflicting Relationships. Except as detailed below, I hereby confirm that to the best of my knowledge, I do not have any current or prior commitments, agreements, or relationships that would present a conflict with my relationship with the Company under my Proprietary Information and Invention Assignment Agreement [specify conflicts; if none, so state]

    *none*

Dated: 11/6/15



By: Sabiha Tudesco

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT

PAGE 11 OF 12

CONFIDENTIAL
v. 10.13.2015

## Exhibit C. Termination Certification

I hereby certify that to the best of my knowledge, I do not possess any Confidential Information, either in original or photocopied form, or other such documents, materials, equipment, or property under the ownership of the Company or its Customers.

I hereby further certify that to the best of my knowledge, I have been and will continue to be in compliance with each and every term outlined in the Invention Assignment and Non-Disclosure Agreement which bears my signature, including the reporting of any and all Work Product I conceived or made that are covered by that Agreement.

I hereby further certify that I will remain in compliance with the Proprietary Information and Invention Assignment Agreement by preserving as confidential all Confidential Information, Work Product, or other information with commercial value or other utility in the business in which the Company or its Customers are potentially engaged. I will not disclose unauthorized information that could be detrimental or harmful to the interests of the Company or its Customers, whether such information is identified by the Company or its Customers as confidential or not.

Upon termination of my employment with the Company, my employment will be with _____ in _____ Division and my work will be in connection with the following projects [describe projects briefly]:

_____

_____

Dated: __11/6/15__



By: __Sabina Tudesca__

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT

PAGE 12 OF 12

CONFIDENTIAL
v. 10.13.2015

58

# EXHIBIT 6

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

August 15, 2018
Sabiha Tudesco
New York, NY

**Re: Terms of Employment**

Dear Sabiha:

Tibrio, LLC, a Delaware limited liability company (the "Company"), has decided to make you this offer of employment. This letter sets forth the terms of the Company's offer, which, if you accept, will govern your employment and shall supersede any previous offers.

Position: Your position is VP of Business Development, and you will be initially reporting to Josh Ogle, CEO. Your start date is 9/8/2015.

Full Time, Exempt Position: Your employment is full time and your position is EXEMPT, which means you will be paid based on an annual salary rather than by the hour and you will not receive overtime pay if you work more than eight (8) hours in a workday or forty (40) hours in a workweek.

Primary Responsibilities: While your responsibilities and duties are subject to change at the Company's discretion, the following summary sets forth your anticipated initial responsibilities:

- Develop new business by analyzing account potential; initiating, developing, and closing sales; recommending new applications and sales strategies.
- Contribute to sales strategies by evaluating current product results; identifying needs to be filled; monitoring competitive products; analyzing and relaying customer reactions.
- Utilize best practices with National Account Management planning including: account forecasting, planning and management, the selling process, the post-sales implementation process, deal economics, metrics, and sale reporting tools.

Compensation: You will be compensated as follows:

1. SALARY - $6,250 twice per month ($150k annually). Pay periods are semi-monthly on the 7th and 22nd of every month.

2. Commission Plan and agreed upon and signed in separate document(s).

3. Unlimited Paid Time Off ("PTO"). PTO is to be used in accordance with the Company's Paid Time Off Policy.

4. Paid sick leave in the amount of eighty (80) hours (ten (10) days) per year, starting at zero (0) and accruing three and thirty-four hundredths (3.34) hours per pay period. The maximum sick accrual at any point is one hundred sixty (160) hours (twenty (20) days). Sick time is to be used in accordance with the Company's Paid Sick Time Policy.

1

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

5. An employee benefit package, including for example medical, dental, vision, life insurance, and disability. Details are included in the plan documents. You will also be eligible for 401k, FSA, paid holidays, and much more.

Employment at Will: Our employment relationship is terminable *at will*, which means that either you or the Company may terminate your employment at any time and for any reason or for no reason at all. You acknowledge that irrespective of any commission-based compensation (if applicable), your employment may be terminable at will and without cause, and that all rights to receive compensation, including but not limited to commissions, shall cease immediately upon such termination. Although your job title, compensation, and benefits may change from time to time, the at-will nature of your employment shall not change, and this letter, along with the Proprietary Information and Inventions Assignment Agreement, sets forth the terms of your at-will employment with the Company and may not be modified or amended except by a written agreement, signed by a duly authorized executive officer of the Company and by you.

Proprietary Information and Inventions Assignment Agreement: As a condition of your employment with the Company, you must sign and comply with the Company's Proprietary Information and Inventions Assignment Agreement, which is attached hereto. It must be signed and returned to us no later than your first date of employment before any employment relationship will be effective. If you need additional time for review, you must obtain an extension from Management in writing.

No Inconsistent Obligations: You represent that you are aware of no obligations legal or otherwise, inconsistent with the terms of this letter or with your undertaking employment with the Company. You will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. You represent and warrant that you have returned all proprietary and confidential information belonging to all prior employers.

Background Check: This offer of employment is contingent upon your agreeing to submit to the Company's Background Check policy as set forth in the accompanying "Consent for Background Check." If you do not agree to the Background Check policy, then this offer of employment will be rescinded and no employment relationship shall have been formed. Similarly, if the Company's review of the report generated by your background check reveals anything that the Company, in its sole discretion, deems inappropriate for your position, then this offer of employment will be rescinded and no employment relationship shall have been formed.

Miscellaneous: You will also be subject to the Company's employment policies and procedures set forth in, among other locations, the Company's Employee Handbook, which you will receive on the first day of your employment and which may be subject to periodic review and modification, in the Company's sole discretion. In making this offer, we are relying upon the truthful information you have provided us about your background and experience, including any information provided in any employment application that you may have submitted to us. This offer is conditioned on your satisfaction of all of the Company's pre-employment requirements, including but not limited to your presentation of acceptable documents establishing your eligibility to work in the United States.

2

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

**Complete Agreement:** Upon your acceptance, this letter, including the Proprietary Information and Inventions and Assignment Agreement attached hereto, will contain the entire agreement and understanding between you and the Company regarding the subject matter herein, and supersedes any and all prior and/or contemporaneous agreements, understandings, term sheets, communications, offers, representations, warranties, or commitments by or on behalf of the Company (oral or written) regarding the subject matter herein. The terms of your employment may in the future be amended, but only by a writing signed by both you and by a duly authorized executive officer of the Company.

**Interpretation: Governing Law and Jurisdiction:** The language in this letter will be construed as to its fair meaning and not strictly for or against either party hereto. In the event a dispute does arise, this letter, including the validity, interpretation, construction, and performance of this letter, shall be governed by and construed in accordance with the substantive laws of the State of California, without reference to its conflicts of law provisions. Each party submits to the exclusive jurisdiction and venue of the state and federal courts located in San Diego County, California for any disputes, action, suit, or other proceeding arising out of or relating to this letter, and each party waives the right to object to such venue or make a claim of forum non conveniens.

**Severability: Counterparts:** If any provision of this letter is held invalid or unenforceable, the remainder of this letter shall nevertheless remain in full force and effect. If any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances. This letter may be executed in counterparts, including by e-mail (i.e., exchanged PDF files), each of which will be deemed an original, and all of which taken together shall constitute one single agreement between the parties with the same effect as if all the signatures were upon the same instrument. An electronic signature shall be as legally effective as an original signature.

If these terms are acceptable, please sign in the space provided below and return this letter to us. Again, we're very excited to have you join us.

Yours truly,

By: _____     5-25-18

Greg Kuchcik, VP of HR     Date

Agreed and Accepted:

By: _____     8/25/2018

Sabina Pacheco     Date

3

# EXHIBIT 7

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

## PROPRIETARY INFORMATION
## AND
## INVENTIONS ASSIGNMENT AGREEMENT

This Proprietary Information and Inventions Assignment Agreement (the "Agreement") is entered into by and between Tibrio, LLC, a Delaware limited liability company (the "Employer" or "Company"), and ___Sabiha Tudesco___, an individual (the "Employee") as of ___8/15/2018___ (the "Effective Date"). Employer and Employee may be referred to herein individually as a "Party" and collectively referred to as the "Parties".

**WHEREAS,** Company offered Employee at-will employment pursuant to Company's Offer Letter, dated ___8/15/2018___, and Employee accepted such terms and conditions contained therein; and

**WHEREAS,** Employee understands and agrees that Employee's agreement to this Agreement is a condition to employment with the Company.

**NOW THEREFORE,** in consideration of the Employee's employment by Company, which the Employee acknowledges to be good and valuable consideration for the Employee's obligations hereunder, the Parties, intending to be legally bound, hereby agree to the foregoing and as follows:

### "AT WILL" STATUS

1.  "At-Will" Status. The Employee understands and acknowledges that the Employee shall remain an "at will" employee, this Agreement does not alter Employee's "at will" employment status, and this Agreement does not constitute an agreement relating to and/or affecting the duration of Employee's "at will" employment. The Company is an "at-will" employer, meaning that either the Company or the Employee can terminate the Employee's employment with the Company at any time and for any reason or for no reason at all.

### DUTIES OF EMPLOYEE

2.  Duty of Confidentiality
    a.  Employee understands and acknowledges that during the course of employment by Company, Employee has and will have access to and come into contact with confidential, secret, and proprietary materials, and other confidential information, in tangible and intangible form, of and relating to the Company and/or its members, managers, officers, directors, employees, clients, consultants, business associates, partners, or joint-venturers ("Confidential Information"). Employee acknowledges and agrees that Employee is being provided access to such Confidential Information, subject to and solely based upon Employee's agreement to the covenants set forth in this Agreement and that Employee would not otherwise be afforded access to such information. Employee further understands and acknowledges that, as between the Parties, the Confidential Information constitutes Company's proprietary information and/or intellectual property, and Company's ability to reserve it for exclusive knowledge and use for Company is highly important and of great value to Company, so much that any improper use or disclosure of the Confidential Information will cause the Company irreparable harm, including financial costs, loss of business advantage, liability under agreements with third parties, civil damages, and criminal penalties. As such, if Employee breaches any of its confidentiality and non-disclosure obligations hereunder, Company shall be entitled to obtain injunctive relief as well as other remedies available at law or in equity, without the necessity of proving actual damages or posting a bond.

- 1 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL



Company's Confidential Information includes, but is not limited to:

- Business processes, business practices, policies, plans, know-how, trade secrets, work-in-process, procedures, research methods, methods of compiling information, methods of creating the Company's systems and databases, procedures, devices, machines, equipment, data processing programs, software, computer models, research projects, and other means used by the Company in the conduct of its business;

- Advertising and marketing designs, advertising compilations, advertising information, negotiation strategies, design information, strategic elements to advertisements, marketing strategies, creative assets, traffic strategy, results from testing, results from reports, creative designs, media buy strategy;

- Algorithms, formulae, notes, reports, developments, records, research papers, operating systems, software design, web design, databases, code, models, experimental processes, inventions, experimental results, security procedures, studies, documents, and analysis;

- Strategies and plans for future business product formulations, potential transactions, marketing plans, pending negotiations, new business, product or other development, new and innovative product ideas, potential acquisitions or divestitures, and new marketing ideas;

- Information with respect to costs, commissions, fees, profits, sales, markets, revenue, pricing strategies, accounting information, accounting records, credit information, sales information, bidding techniques, sales methods and financial information;

- Metrics, mailing lists, the identity of the Company's Customers (as defined below), distributors and suppliers and their names and addresses, the names of customer representatives responsible for entering into contracts for the Company's products or services, the amounts paid by such Customers to the Company, Customer lists, client information, specific Customer needs and requirements, and leads and referrals to prospective Customers;

- The structure, sequence, and organization of the Company's database, together with source code and object code;

- The identity of the Company's employees, their respective salaries, bonuses, benefits, qualifications and abilities, but (with regard to this Section 2(a) only to the extent that it will not restrict the Employee from discussing the Employee's wages and terms and conditions of employment with others; and

- Any and all Inventions (as defined below).

Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information, whether or not marked or otherwise identified as "confidential" or "proprietary," or that would appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Confidential Information can be in any form, including, but not limited to, oral, written, or machine readable, including electronic files. The Company has and will also have access to the confidential information of its Customers ("Customers" shall mean any and all Persons (as defined below) for whom the Company performs services and/or sells products or from whom the Company or Employee obtains information for the purpose of offering products and/or services). Confidential Information shall include not only information disclosed by the Company or its Customers to Employee in the course of his or her

- 2 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

employment, but also information developed or learned by Employee during the course of his or her employment with Company, such as Inventions. Employee acknowledges and agrees that this Agreement does not obligate Company to disclose any information, including, without limitation, Confidential Information, to Employee.

b.   As of the Effective Date, and continuing after termination or expiration of Employee's employment with Company, Employee agrees to treat all Confidential Information in a strictly secret and confidential manner and shall not, without the prior written consent of the Company, directly or indirectly: (i) use, reproduce, disclose, publish, communicate, divulge, or otherwise permit access to all or any portion of the Confidential Information, or any tangible expressions or embodiments thereof, to any person, entity, firm, or company (collectively, "Person(s)"); (ii) use any Confidential Information in any manner other than to perform his or her employment for the Company and his or her obligations hereunder, all in accordance with and subject to the terms herein; and/or (iii) cause the transmission, removal, or transport of Confidential Information from the Company's principal place of business as set forth above. Notwithstanding anything to the contrary herein, nothing herein shall be construed to prevent disclosure of Confidential Information: (i) to Persons designated or employed by Company who need to know such information in connection with their work for Company; (ii) to Employee's legal counsel or accountants who have a "need to know" such information for the purpose of evaluating and/or enforcing Employee's rights under this Agreement (provided that such legal counsel and accountants agree to abide by the confidentiality provisions of this Agreement); (iii) as permitted under Section 2(g), below; and (iv) as may be required by applicable law or regulation, or pursuant to a valid order of a court of competent jurisdiction or an authorized government agency, provided that (1) Employee provides reasonable assistance to Company in opposing such disclosure or seeking a protective order or other limitations on disclosure; (2) Employee's disclosure does not exceed the extent of disclosure required by such law, regulation, or order; and (3) Employee shall promptly provide written notice of any such order to the Legal Department or the Human Resources Department within five (5) business days of receiving such order so that Company can seek a protective order or other remedy or waive its rights under this Section.

c.   Employee agrees to provide reasonable assistance as may be required by the Company to maintain the secrecy and confidentiality of the Confidential Information. Without limiting the generality of the foregoing, Employee shall promptly notify Company of any unauthorized use, release, or disclosure of any Confidential Information.

d.   Employee acknowledges that he or she understands the obligations set forth in this Agreement are not intended to prevent Employee from discussing Employee's wages and/or terms and conditions of Employee's employment with others.

e.   Employee shall not publish, authorize or cause to be published or otherwise assist or cooperate in the preparation or presentation of, any book, blog, post, tweet, article, interview, program or other production or publication of any kind, whether fiction or non-fiction (including, without limitation, by television, radio, newspaper or interactive media such as Facebook, Twitter or any other interactive social network or personal blog) that includes or makes use of any material or information that becomes available to Employee, whether or not related to Employee's services for Company, concerning the Confidential Information. Employee shall also not reverse engineer or attempt to derive the composition or underlying information, structure or ideas of any Confidential Information, no matter how such Confidential Information was obtained by Employee. Any gain or profit of any kind or nature obtained or derived by Employee from the use or exploitation of the Confidential Information shall be held in trust by Employee for the express benefit of Company and shall be remitted thereby to Company, unless Employee establishes that such use or exploitation did not violate the terms herein.

f.   Notwithstanding anything to the contrary herein, the confidentiality and non-disclosure obligations under this Section shall not apply to information that: (i) has become publicly known through

- 3 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

no wrongful act of Employee; (ii) has been lawfully received from a third party without restriction on disclosure and without breach of this Agreement or other agreements of Company; or (iii) must be disclosed as required by law, subject to Section 2(b).

3.    Duty of Non-Solicitation of Customers. Employee agrees that he or she will not, without the prior written consent of the Company, directly or indirectly, individually or on behalf of others, use Company's Confidential Information to solicit, divert, take away, or interfere with the Company's relationship with any and all of its customers with whom Employee had contact during his or her employment and/or regarding whom Employee obtained Confidential Information during the last two (2) years of employment with the Company. Employee acknowledges that in the event of a breach of this Section 3 by Employee, the Company will suffer irreparable harm and will be entitled to obtain injunctive relief, as well as all other remedies available at law or in equity, without the necessity of proving actual damages or posting a bond.

4.    Duty of Non-Interference of Employees. During the term of Employee's employment by Company and for one (1) year thereafter, Employee agrees that Employee will not solicit, raid, interfere with or otherwise disrupt the relationship between Employer and any of its employees, independent contractors or agents. Employee acknowledges that in the event of a breach of this Section 4 by Employee, the Company will suffer irreparable harm and will be entitled to obtain injunctive relief, as well as all other remedies available at law or in equity, without the necessity of proving actual damages or posting a bond.

5.    Duty of No Derogatory Statements. Employee agrees not to make and/or publish in any manner, any derogatory, defamatory or adverse statements, written or verbal, regarding the Company or its current and former owners, directors, managers, members, officers, employees, agents, Affiliates, successors and/or assigns to anyone including, but not limited to, the Company's (or its successor's and/or assign's) directors, officers, employees, agents, vendors, existing Customers or potential Customers that Employee knows that the Company has targeted, or any other third party; provided, however, that the foregoing is neither intended to, nor shall, limit Employee's ability to testify truthfully in response to any valid subpoena or to engage in any other activity compelled or protected by law.

6.    Non-Compete. During the term of Employee's employment with the Company, Employee agrees that he or she shall not directly and/or indirectly compete with or assist others to compete with the Company. Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that by virtue of Employee's position and responsibilities with the Company, engaging in any business that is competitive with the Company will cause the Company great and irreparable harm, and in such case, Company shall be entitled to obtain injunctive relief, as well as other remedies available at law or in equity, without the necessity of posting a bond. If Employee's employment by Company is terminated (whether voluntarily or involuntarily), Employee hereby agrees that the Company may notify any Person employing Employee or evidencing an intention to employ Employee as the existence and terms of this Agreement, and Company may provide such Person with written documentation evidencing Employee's obligation to Company hereunder.

## INVENTIONS

7.    Disclosure of Inventions. Employee acknowledges and agrees that during his or her employment with Company, the Employee may conceive certain inventions, improvements, developments, ideas, or discoveries that result from Employee's duties and services, whether developed solely or jointly with others, of any kind and nature whatsoever, tangible or intangible, to the extent the foregoing results and proceeds are created by such Employee: (a) within the scope of employment for Company, (b) using Company's Confidential Information, or any intellectual property of Company existing at the time prior to such creation, contribution, or work product by Company, or (c) using Company's resources or

- 4 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

facilities (collectively, "Inventions"). Inventions include, but are not limited to: ideas, concepts, inventions, discoveries, developments, plans, publications, research, strategies, techniques, agreements, documents, contracts, improvements, enhancements, agreement terms, know-how, computer programs, code, software design, web design, work in process, works of authorship, data, databases, results, reports, graphics, designs, drawings, algorithms, product plans, product designs, models, patents (including unpublished patent applications), formats, suggestions, arrangements, writings, tests, survey results, compositions, experimental processes, marketing information, advertising information, promotional and public relation concepts, and any other intellectual property or intangible rights, and any derivative works, modifications or amendments to any of the foregoing.

Except as set forth in Section 14 ("Employee Independent Works") and Section 12 ("Exceptions"), Company shall be the sole owner, in perpetuity, throughout the universe, in any and all languages, of all right, title, and interest in and to the Inventions. Accordingly, the Employee agrees to disclose to Company in confidence any and all Inventions that Employee solely or jointly conceives or reduces to practice while employed by Company.

8.      Assignment of Inventions. Employee acknowledges and agrees that all Inventions shall automatically become the sole property of Company as of the time of such Inventions' creation and are intended to be "works for hire" under the U.S. Copyright Act, 17 U.S.C. §101. To the extent that any Inventions are not automatically owned by Company upon creation, Employee hereby irrevocably assigns, transfers, and conveys to Company, for no additional consideration, and Company hereby accepts, all of Employee's right, title and interest throughout the world in and to all rights and materials related to or comprising the Inventions, and all intellectual property rights therein and thereto, including, but not limited to: (a) all copyrights and similar protections and renewals and extensions of copyright; (b) all patents, patent applications, patentable subject matters, and all issuances, divisions, continuations-in-part, reissues, extensions, re-examinations, and renewals thereof, and any subsequent patents with the same inventive subject matter; (c) all trademarks, trade names, service names, service marks, logos, trade dress, brand names and domain names, whether common law or otherwise, as well as all trademark registrations, applications and all issuances, extensions, and renewals thereof ("Trademarks") together with the goodwill of the business connected with the use of, and symbolized by, the Trademarks; (d) any and all causes of action that may have accrued or accrue in Employee's favor for infringement of the Inventions; (e) any and all royalties, fees, income, payments and other proceeds due or payable with respect to any and all of the foregoing; and (f) all other rights of any kind whatsoever of Employee accruing under any of the foregoing provided by the applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit Company's right, title or interest in and to any Inventions or other intellectual property rights so as to be less in any respect than that Company would have had in the absence of this Agreement. Employee waives any and all rights that Employee may have or claim to have regarding the Inventions.

9.      Employee's Obligations. Employee agrees to cooperate with Company in executing the necessary documents to assign such Inventions to Company, if necessary. In addition, Employee shall, at the expense and on behalf of Company, cooperate with and do all acts and things requested by Company to obtain, establish, preserve, enforce and protect Employer's rights and interests in and to the Inventions, including, but not limited to, preparing and signing such applications, papers, instruments, and other documents as the Company may deem necessary for it to obtain and maintain patents, copyrights, trade secrets, and Trademarks within the United States, or elsewhere, or both.

10.     Power of Attorney. In the event Employee fails to promptly execute, acknowledge or deliver to Company any agreement, quitclaim, assignment, or other document necessary to apply for, prosecute, obtain, or enforce any patent, copyright, trademark, or other right or protection relating to any Invention, whether due to mental or physical incapacity or any other cause, Employee hereby irrevocably designates

- 5 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

and appoints the Company and each of its duly authorized officers and agents as his or her agent and attorney-in-fact (which shall be deemed coupled with an interest), with full right, power and authority to act for and in his or her behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of patents, copyrights, or other rights or protections with the same force and effect as if executed and delivered by the Employee.

11.    Moral Rights.  The foregoing assignment in Section 8 includes all rights of paternity, integrity, and disclosure, and any other rights that may be known as or referred to as "moral rights" (collectively, "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law, Employee hereby waives such Moral Rights which may now or hereafter be recognized and consents to any action of Company that would violate such Moral Rights in the absence of such consent, including, without limitation, any right: (a) to approve such revisions, deletions, abridgments or other changes in the Inventions; or (b) to withdraw the Inventions from distribution.  Company shall have the right, but not the duty, to use, adapt and change the Inventions, or any part thereof, and to combine the same with other works, and to vend, copy, publish, reproduce, record, transmit, telecast by radio or television, perform, photograph with or without sound (including spoken words, dialogue and music synchronously recorded), and to communicate the same by any means now known or hereafter devised, either publicly or otherwise, and for profit or otherwise, throughout the world in perpetuity.

12.    Exceptions.  Notwithstanding any provision of this "Inventions" Section, Employee shall not be required to assign, nor shall he or she be deemed to have assigned, any of Employee's rights in any inventions or other work product that Employee retains as a matter of law under California Labor Code §2870 (reprinted in its entirety on **Exhibit A**, attached to this Agreement, and hereby incorporated herein by this reference)

13.    No Incorporation; License.  Employee shall not incorporate any intellectual property rights that are owned by any third party into any Invention without obtaining the prior written consent of Company.  To the extent that Employee incorporates any Employee Independent Works (as defined below) into any Invention with Company's prior written consent, then Employee hereby irrevocably grants to Company a royalty-free, fully paid-up, perpetual, transferable, irrevocable, worldwide, non-exclusive license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, offer to sell, sell, import, distribute and otherwise exploit such Employee Independent Works as part of or in connection with such Invention(s), and to practice any method related thereto.

## EMPLOYEE INDEPENDENT WORKS AND RELATIONSHIPS

14.    Employee Independent Works.  Except as disclosed on **Exhibit B**, attached to this Agreement and hereby incorporated by this reference, Employee does not know anything about the Company's Confidential Information, other than the information he or she has learned from the Company.  Employee has also disclosed on **Exhibit B** a complete list of all inventions, copyrighted material, patents, patent applications, original works of authorship, developments, and trade secrets proprietary to Employee or which Employee has any interest in, and that does not otherwise belong to Employee's previous employers or any third parties, and which Employee wants to exclude from the application of this Agreement (collectively, "Employee Independent Works").  The Company agrees to receive and hold all such disclosures in confidence.  Notwithstanding anything to the contrary, Employee understands and agrees that Employee is restricted from using Company's Confidential Information, resources, or facilities for any creation or development of its Employee Independent Works.

15.    Prior Commitments.  Employee has not entered into and shall not enter into any other agreements, relationships, or other commitments to any other Person that, during the term of the Employee's employment with Company, do or will conflict with Employee's obligations to the Company

- 6 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

under this Agreement. Employee warrants that there is no other existing contract or duty on his or her part that conflicts with or is inconsistent with this Agreement.

16.    Proprietary Information and Trade Secrets of Others.  During the term of Employee's employment with Company, Employee will not improperly disclose to the Company, or improperly use, or induce the Company to improperly use, any confidential information or trade secrets of any former employer or any other Person to whom Employee owes a duty of confidentiality.

## SECURITY

17.    Security Access.  Employee represents, warrants, and covenants that he or she shall:

a.    comply with all Company security policies and procedures as in force as of the Effective Date, and as may be updated by Company from time to time, including, but not limited to, those regarding computer equipment, facilities access, key cards, access codes, social media and instant messaging systems, computer systems e-mail systems, computer networks, data security, passwords, document storage systems, and any and all other Company facilities and communication technologies ("Facilities and Access Resources");

b.    not access or use any Facilities and Access Resources, except as authorized in writing by Company;

c.    not access or use any Facilities and Access Resources in any manner following termination of employment with Company, whether termination is voluntary or involuntary.

Employee agrees to notify company promptly in the event Employee learns of or suspects any violation of the foregoing by others or any other misappropriation or unauthorized use, reproduction, or reverse engineering or tampering with any Facilities or Access Resources.

18.    Possession, Ownership, and Return of Company Property.  Company Property (as defined within) is, as between the Parties, the sole and exclusive property of Company, its Affiliates or its Customers. Upon termination (voluntary or otherwise) of Employee's employment with the Company, Employee shall immediately deliver and return to Company any and all Company property, including, without limitation, all documents and data pertaining to his or her employment and all Confidential Information of the Company and/or its Customers, and any other materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished to Employee by Company, whether prepared by Employee or otherwise coming into his or her possession or control (collectively, "Company Property").

Within five (5) days after Employee's termination (voluntary or otherwise), Employee shall also complete, sign and return to the Company **Exhibit C** of this Agreement, attached hereto and hereby incorporated herein by this reference. Employee will not retain any written or other tangible material containing any information concerning or disclosing any Company Property. Further, Employee shall delete or destroy all copies of any such Company Property that remain in Employee's possession or control, including those stored on any non-Company devices, networks, storage locations. Employee recognizes that the unauthorized taking of any of the Company Property may be punishable as a crime. Employee acknowledges that knowingly accessing and extracting data from a computer system without authorization may be a crime, and that unauthorized taking of the Company's trade secrets or other Company Property could result in civil liability, and that wilful misappropriation may result in an award against Employee for triple the amount of the Company's damages and the Company's attorney's fees in collecting such damages.

- 7 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

## USE OF EMPLOYEE'S NAME AND IMAGE

19.     Use of Employee's Name and Image.  Company shall have the right to use the name, voice, photograph, likeness, and biographical data of Employee, as well as recordings, transcriptions, films, tapes, and other reproductions thereof, and Employee gives his or her consent to these uses for so long as the Company deems advisable for all legitimate business purposes of Company.  Employee hereby forever releases Company and its directors, officers, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after Employee's employment with Company in connection with Company's use of Employee's name, voice, photograph, or likeness.

## MISCELLANEOUS

20.     Modification of Agreement.  This Agreement may be modified or amended only with the written consent of both Employee and the Company.

21.     Entire Agreement.  This Agreement, including all Exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof. This Agreement supersedes all prior and contemporaneous agreements, understandings, restrictions, warranties, or representations, whether written or oral, between the Parties relating to this subject matter.

22.     Severability, Interpretation.  If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect. The Parties agree that any ambiguity set forth in this Agreement shall not be interpreted against the Company and that this Agreement shall be deemed drafted by both Employee and Company.

23.     Governing Law, Jurisdiction and Venue.  This Agreement shall be governed by the laws of California, without reference to its conflicts of law provisions.  Any action, suit or proceeding by either Party arising out of or relating to this Agreement shall be brought exclusively in any state or federal court located in the county of San Diego.  The Parties hereby irrevocably submit to the exclusive jurisdiction and venue in San Diego County courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

24.     Survival.  Employee agrees that the provisions contained in this Agreement shall survive any termination of Employee's employment with Company.

25.     Assignment and Successors.  This Agreement, and all of the rights and obligations hereunder, are not assignable, in whole or in part, by Employee, and any such attempted assignment shall be null and void.  This Agreement is freely assignable by Company.  Employee agrees that the terms of this Agreement shall inure to the benefit of and may be enforced by the Company and the Company's successors or assigns. Subject to the first sentence of this Section 25, Employee agrees that the terms of this Agreement shall be binding upon him or her and his or her executors, administrators, legatees, and other successors in interest.

26.     Payment of Costs and Attorneys' Fees.  If either Party institutes any legal action to enforce its rights hereunder or to recover damages for breach of the Agreement, the prevailing Party in such action shall be entitled to recover from the other Party all costs and expenses incurred in connection therewith, including, but not limited to, any attorneys' fees, attorneys' costs and court costs, in addition to any other relief to which that Party may be entitled.

- 8 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

27.    OPPORTUNITY FOR REVIEW.  EMPLOYEE ACKNOWLEDGES THAT HE OR SHE HAS READ THIS AGREEMENT IN ITS ENTIRETY AND HAS HAD REASONABLE OPPORTUNITY TO CONSULT WITH LEGAL AND FINANCIAL COUNSEL BEFORE EXECUTING THE AGREEMENT, THAT HE OR SHE FULLY UNDERSTANDS THE TERMS AND CONDITIONS HEREIN, AND THAT HE OR SHE IS NOT RELYING ON ANY STATEMENTS OR REPRESENTATIONS BY ANY PERSON, EXCEPT THOSE STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN.

28.    Waiver of Breach.  The waiver by either Party of a breach of any provisions of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach. A delay or failure by either Party to exercise a right under this Agreement, or a partial or single exercise of that right, shall not constitute a waiver of that or any other right.

29.    Counterparts, Electronic Copy.  This Agreement, for the convenience of the Parties, may be executed in any number of counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same Agreement.  A facsimile or electronic transmission with facsimile or electronic signatures of this fully executed Agreement constitutes and original and legally binding document.

30.    Notices.  Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given: (a) if delivered personally or by commercial messenger or courier service, then when actually delivered; (b) if sent by certified or registered mail, return receipt requested, then upon verification of receipt; or (c) if sent via e-mail or facsimile transmission, then upon acknowledgment of receipt, in each case addressed to the addresses set forth on the first page of this Agreement or to such other addresses may be specified upon written notice to the other Party.

EMPLOYEE ACKNOWLEDGES THAT THIS AGREEMENT AFFECTS EMPLOYEE'S RIGHTS TO INVENTIONS THAT EMPLOYEE DEVELOPS AND/OR CONCEIVES DURING HIS OR HER EMPLOYMENT, AND ADDITIONALY RESTRICTS EMPLOYEE'S RIGHT TO DISCLOSE OR USE THE COMPANY'S CONFIDENTIAL INFORMATION DURING OR SUBSEQUENT TO EMPLOYEE'S EMPLOYMENT.

EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS. EMPLOYEE HAS COMPLETELY FILLED OUT **EXHIBIT B** TO THIS AGREEMENT AND HAS RECEIVED A COPY OF THIS WRITTEN NOTIFICATION.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**COMPANY**

BY (SIGNATURE): _____

CRAIG AVERONIA
VP HR

JOSH OGLE, CEO

**EMPLOYEE**

BY (SIGNATURE): _____

DocuSigned by:

F792D329CE2F473...

PRINT NAME Sabiha Tudesco

- 9 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL



## EXHIBIT A

### COMPANY'S WRITTEN NOTIFICATION TO EMPLOYEE OF
### CALIFORNIA LABOR CODE §2870

In accordance with California Labor Code § 2870, you are hereby notified that this Agreement does not require you to assign to Company certain inventions, and as further described below.

The following is the text of California Labor Code §2870:

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

I hereby acknowledge receipt of this written notification.

Dated: 8/25/2018

By: _____

Name: Sabiha Tudesco

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL

 tibrio

## EXHIBIT B

### EMPLOYEE STATEMENT

1.  Confidential Information. Except as detailed below, I hereby confirm that to the best of my knowledge I am currently unaware of any information pertaining to the Company's business, the Company Property, or Company's Customers, except what has been disclosed by the Company or its Customers directly to me [specify such information; if none, so state]

    None

2.  Employee Independent Works. Except as detailed below, I hereby confirm that to the best of my knowledge, either personally or with others, I have not made or reduced to practice any inventions or other intellectual property [specify inventions (including a title, date of creation, a brief description, and any other applicable identifying information); if none, so state]

    None

Dated:  8/25/2018

By: _____

F792D323CE2F473...

Name:  Sabiha Tudesco

- 11 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL



## EXHIBIT C

### TERMINATION CERTIFICATE

Tibrio, LLC ("Company") requests that you carefully review, complete, and execute this Termination Certificate. If your response requires additional space, please attach and initial any supplemental pages. Capitalized terms that are used but not defined herein shall have the meaning ascribed to them in that certain Proprietary Information and Inventions Assignment Agreement between you and the Company, dated as of _____ (the "Agreement")

1.      I [have/have not (circle one)] copied, saved, retained, disclosed, or transmitted in any form whatsoever, any Company Property except in the course of performing my duties for Company. If "have" is circled, identify the protected Company Property copied, saved, retained, disclosed, or transmitted in connection with a non-Company business-related purpose, the date of the incident, the parties involved, and the person and/or location to whom/where the confidential, proprietary or trade secret information was copied, saved, retained, disclosed or transmitted:

_____

_____

_____

2.      During my employment with Company, I [have/have not (circle one)] downloaded and/or stored Company files or data on my home or personal computer. If "have" is circled, identify the Company files or data downloaded or stored on the home or personal computer:

_____

_____

_____

3.      During my employment with Company, I [had/did not have (circle one)] the ability to access files or data from Company's servers remotely. If "had" is circled, identify the Company files or data accessed remotely, and the computer media used for remote access:

_____

_____

4.      I hereby certify that, except as disclosed in Section 1 of this **Exhibit C**, I do not possess any Company Property, either in original or photocopied form, or other such documents, materials, equipment, or property under the ownership of the Company or its Customers, including, without limitation, all keys, access cards, credit cards, identification cards, phones, computers, electronic storage media or devices electronic mail devices, electronic organizers, and any other Samples.com-issued electronic devices.

5.      I hereby further certify that I have been and will continue to be in compliance with each and every term outlined in the Agreement which bear my signature, including, without limitation, the post-

- 12 -

DocuSign Envelope ID: A372957F-54FC-4258-99D2-3C6A6992DCD8

CONFIDENTIAL



employment non-solicitation obligations and the reporting of any and all Inventions I conceived or made that are covered by that Agreement.

6.      I hereby further certify that I will remain in compliance with the Agreement by preserving as confidential all Company Property, including, without limitation, all of Company's Confidential Information.

7.      Upon termination of my employment with the Company, I have accepted or intend to accept, or plan to apply for or otherwise seek, employment with _____ in _____ Division and my work will be in connection with the following projects [list your title and describe duties and projects briefly]:

_____

_____

I understand that the above is a summary only and does not purport to include all my continuing obligations to Company under the terms of the Agreement. In the case of any conflict between this Termination Certification and the Agreement, the terms of the Agreement shall control.

I certify that the foregoing is true and correct and was executed on: _____

By: _____

Name: _____

# EXHIBIT 8



August 23, 2018
Sabiha Tudesco
New York, NY 10011

**Re: Terms of Employment Change**

Dear Sabiha,

Congratulations! Tibrio (the "Company") has decided to make this change in offer of employment. This letter sets forth the terms of the Company's offer, which, if you accept, will govern your employment.

Other than the changes listed below, all aspects of your initial Employment Agreement(s) will remain in effect. If you'd like to change any aspects of your original agreement(s) other than those listed below, please do so prior to signing and they can be added in. If you do not have your original agreement, and need one, please see HR for a signed copy.

Changes to Employment Agreement

- Effective on the paycheck on 9/7/18 your salary will be increased to $ 7291.67 per pay period (175k if annualized).

- Commission plan will remain in effect as most previously dated. As the department grows it may make sense to update this plan at which time a new commission agreement may be drawn up for review and signature by yourself and the CEO.

- In the event of a sale, 1.5x annual salary as rollover RSUs if applicable.

- Effective Immediately promotion to Chief Revenue Officer (CRO). As part of this promotion the additional duties will be expected in addition to all current duties.

  o Responsible for all areas of revenue including Sales, Business Development, Content, Media and more.
  o Strategic business decisions in order to help the company grow as a whole.
  o More involvement in Executive discussion and meetings as part of the C-team.

If these terms are acceptable, please sign in the space provided below and return this letter to us. Again, we're very excited to be able to offer these changes.

Yours truly,

By: _____          _____
    Greg Kuchcik, VP of HR                                Date
    Zeeto /Tibrio

Agreed and Accepted:

_Sabiha Tudesco_                                      8/23/18
Sabiha Tudesco                                       Date

_____

Page 1 of 1

https://drive.google.com/file/d/0B4ftFNNWerWWR3g3bmF2d0Rqa1cwLUNTR3Q1R0JKa2ZrSUdv/view 1/1

# EXHIBIT 9

### Exhibit C. Termination Certification

I hereby certify that to the best of my knowledge, I do not possess any Confidential Information, either in original or photocopied form, or other such documents, materials, equipment, or property under the ownership of the Company or its Customers.

I hereby further certify that to the best of my knowledge, I have been and will continue to be in compliance with each and every term outlined in the Invention Assignment and Non-Disclosure Agreement which bears my signature, including the reporting of any and all Work Product I conceived or made that are covered by that Agreement.

I hereby further certify that I will remain in compliance with the Proprietary Information and Invention Assignment Agreement by preserving as confidential all Confidential Information, Work Product, or other information with commercial value or other utility in the business in which the Company or its Customers are potentially engaged. I will not disclose unauthorized information that could be detrimental or harmful to the interests of the Company or its Customers, whether such information is identified by the Company or its Customers as confidential or not.

Upon termination of my employment with the Company, my employment will be with _____Self employed_____ in _____TBD_____ Division and my work will be in connection with the following projects [describe projects briefly]:

_____To be determined_____

Dated 12/3/18

Sebstha Tudesco

By 

Print & Sign

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT

CONFIDENTIAL
v. 10.13.2015

PAGE 12 OF 12