UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZEETOGROUP, LLC; TIBRIO, LLC,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>NICHOLAS FIORENTINO, an individual; SABIHA TUDESCO, an individual; INTERNET THINGS, LLC; SIMPLY SWEEPS, LLC; CREDIREADY, LLC; TWO MINUTE MEDIA TOPICS, LLC; and DOES 1-100, inclusive,<br><br>　　　　　　　　　　Defendants. | Case No.: 19-CV-458 JLS (NLS)<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION**<br><br>(ECF No. 13) |

Presently before the Court is Plaintiffs Zeetogroup, LLC and Tibrio, LLC's Motion for Temporary Restraining Order and Preliminary Injunction ("Mot.," ECF No. 13). Also before the Court are Defendants' Response in Opposition to ("Opp'n," ECF No. 17) and Plaintiffs' Reply in Support of ("Reply," ECF No. 21) the Motion.[1] Having considered the Parties' arguments, the evidence, and the law, the Court rules as follows.

---

[1] Defendants also filed evidentiary objections to the Declarations of Stephan Goss offered in support of Plaintiffs' Motion. ECF No. 16. The Court struck that document from the docket at the request of Defendants. ECF No. 28. The Court notes that, had it considered the merits of Defendants' objections,

# BACKGROUND

Plaintiffs ZeetoGroup, LLC and its subsidiary, Tibrio, LLC, are San Diego-based internet lead generation companies. Mot. at 5. Plaintiffs own and operate samples.com and getitfree.us, which are websites that "aggregate free samples ranging from cleaning supplies to snack foods and give them away to customers who visit the websites." *Id.* at 7. Both companies derive their profits from advertising by "connecting consumers to advertisers" and "allowing advertisers to put ads on the websites." *Id.*

Defendant Internet Things, LLC is a competing internet lead generation company. *Id.* Internet Things owns and operates multiple subsidiaries, including Defendants Simply Sweeps, LLC dba simplysweeps.com; CrediReady, LLC dba crediready.com; and Two Minute Media Topics, LLC dba twominutemedia.com. *Id.* Defendant Nicholas Fiorentino is the founder and CEO of Internet Things. *Id.*

Sometime in 2018, Mr. Fiorentino began recruiting a number of Plaintiffs' employees. *Id.* at 8. Among those employees was Rocky Iorio. *Id.* at 7–8. Plaintiffs employed Mr. Iorio as an Affiliate Marketing Manager from 2015 until November 1, 2018, when Mr. Iorio accepted a job with Defendant Internet Things. *Id.* at 7. Immediately after accepting his new position, Mr. Iorio gave Plaintiffs his two weeks' notice. *Id.* On November 9, 2018, during Mr. Iorio's final two weeks working for Plaintiffs, Mr. Fiorentino reached out to Mr. Iorio and asked him for a "list of [Plaintiffs'] big buyers." *Id.* Mr. Iorio complied with this request and sent Mr. Fiorentino screen shots of Plaintiffs' "propriet[ary] platform . . . listing around 80 of [Plaintiff]s' biggest advertising campaigns and all of the associated metrics for each campaign." *Id.* at 8; Declaration of Stephan Goss ("Goss Decl.") Ex. A, ECF No. 13-1.

Just three weeks after starting work with Defendants, Mr. Iorio was fired. *Id.* at 8. Shortly after his firing, on February 9, 2019, Mr. Iorio sent an email to Plaintiffs' Chief

---

the Court would have denied those objections for the purposes of this Motion. *See Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("[T]he rules of evidence do not apply strictly to preliminary injunction proceedings.").

Revenue Officer, Shayne Caldwell, detailing the communications between Mr. Iorio and Mr. Fiorentino while Mr. Iorio still worked for Plaintiffs. Declaration of Shayne Cardwell ("Cardwell Decl.") ¶ 5, ECF No. 13-2. Mr. Iorio included in this February email the screen shots of the list taken from Plaintiffs and he resent a copy of the image to Plaintiffs' CEO, Stephan Goss, on March 6, 2019. *See id* ¶ 9; Goss Decl. ¶ 7.

Another employee hired away from Plaintiffs by Mr. Fiorentino was Defendant Sabiha Tudesco. Mot. at 8. Ms. Tudesco worked as the Chief Revenue Officer for Plaintiffs and, in that position, was familiar with the list sent by Mr. Iorio and knew it was Plaintiffs' property. *Id.* Despite this knowledge, Plaintiffs allege Ms. Tudesco "proceeded to contact the clients on the list and recruit them to Internet Things." *Id.* Ms. Tudesco denies having seen the list until after the litigation had commenced. Declaration of Sabiha Tudesco ("Tudesco Decl.") ¶ 20, ECF No. 17-3.

Plaintiffs filed suit on March 8, 2019, "seeking damages and a restraining order against the misappropriation of trade secrets by Fiorentino, Tudesco, Internet Things, and all of Internet Things' subsidiaries." Mot. at 9. Plaintiffs claim that as a result of the misappropriation, their sales have declined by an average of $1,000,000 a month. *Id.* This decline forced Plaintiffs to lay off 27 employees. *Id.* Further, the use of the list has caused market confusion and irreparable harm to Plaintiffs' business relationships. *Id.* Plaintiffs filed the current Motion on April 4, 2019, seeking a temporary restraining order ("TRO") and preliminary injunction.[2] *See generally* Mot. Specifically, Plaintiffs ask the Court to enjoin Defendants "from using any of the information and be prohibited from contacting the advertisers disclosed by Mr. Iorio." Mot. at 6.

## LEGAL STANDARD

A preliminary injunction is an equitable remedy aimed at preserving the status quo and preventing the occurrence of irreparable harm during the course of litigation. *See* Fed.

---

[2] The Court set the Motion for a noticed hearing without issuing a TRO to give Defendants the opportunity to respond. The Court therefore considers only Plaintiffs' request for a preliminary injunction.

R. Civ. P. 65. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction must "state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1027 (N.D. Cal. 2003) (citing *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000)). Rule 65 also requires the movant to give security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c).

## ANALYSIS

### I. Likelihood of Success on the Merits

Plaintiffs seek an injunction pursuant to all three claims alleged in their Complaint: (1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 28 U.S.C. §§ 1836 *et seq.*, and California's Uniform Trade Secret Act ("CUTSA"), Cal. Civ Code §§ 3426 *et seq.*, (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and (3) intentional interference with prospective economic relations.

///
///
///
///
///
///
///

### A. *Misappropriation of Trade Secrets*[3]

To state a claim for misappropriation of trade secrets, Plaintiff must show "(1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret." *Sun Distrib. Co., LLC v. Corbett*, No. 18-CV-2231-BAS-BGS, 2018 WL 4951966, at *3 (S.D. Cal. Oct. 12, 2018).

#### 1. *Trade Secret*

Both the DTSA and CUTSA define "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d). A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 250–52 (1968)). Generally, the plaintiff must "describe the subject matter of the trade secret with sufficient

---

[3] Because the elements of a trade secret misappropriation claim under the DTSA and CUTSA are substantially similar, the Court will analyze both claims together. *See Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-6930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018). As other district courts in California have done, *see e.g.*, *id.*, the Court will apply both federal and California trade secret case law to both causes of action.

particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (citing *Diodes*, 260 Cal. App. 2d at 253).

Plaintiffs state the trade secret at issue is a list of Plaintiffs' "biggest advertising campaigns and all of the associated metrics of the campaign." Mot. at 8. The list "identified advertisers, disclosed what specific campaigns were working most efficiently for [Plaintiffs], how much revenue each campaign was generating, the price point at which the traffic was being sold, and the competitive performance metrics on how the campaigns compared to each other." *Id.* at 12. Plaintiffs claim they "spent considerable time and money" creating the list. *Id.* at 8.

Defendants first argue that the customer list is publicly available and therefore does not constitute a trade secret. Opp'n at 7, 14–15. As an internet lead generation company, Plaintiffs' customers "may be obtained by looking at its website's TCPA 'Marketing Partners' section, which by law is required to list out every customer a company does business with that could potentially call or text the user." *Id.* at 7. Defendants point out that Plaintiffs' website lists all of their customers in accordance with this rule and that the identities of their customers are publicly available. *Id.*

The Court agrees that if the list contained just the identities and locations of customers, it would not constitute a trade secret because not only would that information be publicly available, but it would have no economic value. The list acquired by Defendants, however, contains far more. As noted above, the list also contains the revenue generated by each ad campaign and various performance metrics associated with those campaigns. This type of information "can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product." *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997). Indeed, the value of the list obtained by Defendants "is in the completeness and details of the list," *Sun Distributing Co.*, 2018 WL

4951966, at *4, and the fact Plaintiffs "expended time and effort identifying customers with particular needs or characteristics." *Wanke, Indus., Commercial, Residential, Inc. v. Keck*, 209 Cal. App. 4th 1151, 1175 (2012). This leads the Court to conclude that Plaintiffs' list contains trade secrets. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets.").

Defendants next attempt to rebut Plaintiffs' claims that their business model and website components constitute trade secrets. In support of this argument, Defendants submit the expert report of Doug Bania, whom Defendants "asked to review Exhibit D of the Goss Declaration . . . and investigate if the components and aspects of the websites built by [Plaintiffs] highlighted by Mr. Goss are unique to [Plaintiffs]." Declaration of Doug Bania ¶ 2, ECF No. 17-5. Mr. Bania concludes in his report that his "investigation indicates [Defendants have] not misappropriated or mis-used any unique or exclusive properties belonging to [Plaintiffs]." *Id.* ¶ 73. But this argument, and the expert report in general, are not relevant to the Motion at hand. Nowhere in the report does Mr. Bania discuss the list or its contents, which are actually at issue. While Plaintiffs make several allegations in their Complaint that Defendants misappropriated Plaintiffs' business model and website components—including those highlighted in Exhibit D—those allegations are not the focus of this Motion. Instead, the only trade secret at issue is the list obtained by Mr. Fiorentino from Mr. Iorio, which Mr. Bania did not address.

In addition to establishing the existence and ownership of a trade secret, Plaintiffs also have established that they took "reasonable measures to keep such information secret." *See* 18 U.S.C. § 1839(3)(A). During the relevant time period, Plaintiffs required all of their employees, including Mr. Iorio and Ms. Tudesco, to sign "Proprietary Information and Inventions Assignment Agreements" that state the employees agreed to treat "client lists, client information, [and] specific Customer needs and requirements" as confidential information. Mot. at 8–9 (citing Goss Decl., Exs. B–C). Further, the information contained in the list was password protected. Reply at 5, 6; Goss Decl. ¶ 6.

Because the information has economic value and Plaintiffs took reasonable measures to protect the information, the Court finds Plaintiffs have established they have a protectable trade secret.

### 2. *Misappropriation*

There is no serious dispute that Defendants misappropriated Plaintiffs' customer list. Mr. Fiorentino admits that he "request[ed] a list of buyers from Mr. Iorio before he started working" for Defendants. Opp'n at 6. Mr. Iorio complied with that request and sent the list to Mr. Fiorentino. Mot. at 7. In support, Plaintiffs have included the email messages between Mr. Iorio and Mr. Fiorentino, which clearly show the misappropriation occurred. *See* Goss Decl., Ex. A. The Court therefore finds that Plaintiffs have established misappropriation.

Having found that Plaintiffs have shown both the existence and ownership of a trade secret and that Defendants misappropriated that trade secret, the Court concludes that Plaintiffs are likely to succeed on the merits of their misappropriation of trade secrets claims.

### B. *California Unfair Competition Law*

California's UCL prohibits businesses from engaging in unlawful, unfair, or fraudulent business acts or practices. Cal Bus. & Prof. Code § 17200. To bring a claim under the UCL, a plaintiff must show that the defendant engaged in business practices that were prohibited by law. *Stevens v. Super. Ct.*, 75 Cal. App. 4th 263, 285 (2005).

Plaintiffs claim that "Defendants' actions [were] unlawful because they violated California and [f]ederal trade secret laws through their misappropriation of [Plaintiffs'] client list and associated metrics." Mot. at 14. Defendants do not contest that Plaintiffs are likely to succeed on the merits as to this cause of action, and the Court finds Plaintiffs' arguments persuasive. Thus, the Court finds that Plaintiffs are likely to succeed on the merits of their UCL claim.

///

///

### C.     *Intentional Interference with Prospective Economic Relations*

To state a claim for intentional interference with prospective economic relations, a plaintiff must show:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Youst v. Longo*, 43 Cal. 3d 64, 71 n.6 (1987).

Under California law, CUTSA preempts common law claims that are "based on the same nucleus of facts as the misappropriation of trade secrets claim." *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1034 (N.D. Cal. 2005). "In analyzing this, courts focus on 'whether [the] claims are not more than a restatement of the same operative facts supporting trade secret misappropriation. . . . If there is no material distinction between the wrongdoing alleged in a [C]UTSA claim and that alleged in a different claim, the [C]UTSA claim preempts the other claim.'" *Sun Distrib. Co.*, 2018 WL 4951966, at *3 (quoting *Convolve, Inc. v. Compaq Comp. Corp.*, No. 00 CV 5141(GBD), 2006 WL 839022, at *6 (S.D.N.Y. Mar. 31, 2006)) (internal quotations omitted). But if the claims asserted are based on alternative theories of liability and new facts, CUTSA does not preempt the claim. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 238–39 (2010).

Here, Plaintiffs claim is entirely predicated on the misappropriation of Plaintiffs' trade secrets by Defendants. Plaintiffs allege no other basis for this common law claim separate from their misappropriation claims. The Court therefore concludes that CUTSA preempts Plaintiffs intentional interference claim. Having determined that Plaintiffs have not established the first factor for their intentional interference claim, the Court **DENIES** Plaintiffs' request for a preliminary injunction as to that claim. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting if a party fails to establish the first factor, the court "need not consider the remaining three").

## II. Likelihood of Irreparable Harm

Next, Plaintiffs must make a clear showing that irreparable harm will occur absent the preliminary injunction. This clear showing requires a plaintiff to prove more than a mere "possibility" of irreparable harm; instead, they must "demonstrate that irreparable injury is likely in the absence of an injunction." *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). A showing that the party intends "to make imminent or continued use of a trade secret," however, "will almost always certainly show irreparable harm." *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (citing *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 92–93 (3rd Cir. 1992)). "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001).

Plaintiffs claim that the list containing trade secrets is the "life blood" of their business. Mot. at 8. "Defendants are in direct competition with Plaintiffs and are actively using" the trade secrets. *Id.* at 15. Plaintiffs allege that Defendants' use of the list has caused a decline in advertising sales revenue of "$1,000,000 per month forcing Plaintiffs to terminate 27 employees." *Id.* at 15–16. Plaintiffs allege this staggering loss is "[b]ecause an advertiser only has limited funds to spend" and Defendants' solicitation of Plaintiffs' customers forces Plaintiffs "to split those amounts with Defendants." *Id.* at 9. Plaintiffs also claim that the "exploitation of the list and disparaging comments made by Defendants . . . ha[ve] caused market confusion and . . . irreparable harm to [their] reputation." *Id.* The injunction is necessary, according to Plaintiffs, because "[a]s long as Defendants continue to use [Plaintiffs'] trade secrets, advertisers will become less incentivized to work with [Plaintiffs] or even come back to [Plaintiffs] following adjudication of this matter." *Id.* at 16.

Defendants counter the claims of irreparable harm in three ways. First, Defendants Mr. Fiorentino and Ms. Tudesco both deny ever having used the list in any way. Opp'n at 7, 14; Tudesco Decl. ¶ 20 (stating she never saw the list and grew Defendants' "advertiser-base strictly through [her] networking and the existing relationships [she] secured over [her] 15+ years of being in digital marketing"); Declaration of Nicholas Fiorentino ("Fiorentino Decl.") ¶ 23, ECF No. 17-2 ("[Mr. Fiorentino] never referenced [the list], needed it, found it valuable, or distributed it to anyone prior to the complaint being served."). Because Defendants claim they have not used the list for their own benefit or passed the information on to any other competitor, the Court cannot attribute the harm claimed by Plaintiffs to Defendants having obtained the list. Opp'n at 14–15.

Second, Defendants claim that they had "less than $10,000 in total revenue from all of [the] customers identified in the Plaintiffs' customer list." Fiorentino Decl. ¶ 2. Defendants contend this amount pales in comparison to the millions in damages Plaintiffs claim and therefore cuts against Plaintiffs' claims of irreparable harm. *Id.* ¶¶ 2–3.

Finally, Defendants offer to "purge and delete all copies of Plaintiffs' [customer list] in their possession." Opp'n at 15. According to Defendants, this would ensure that no future use of the trade secrets would occur. *Id.*

Based on the evidence before it, the Court finds that Plaintiffs have met their burden in showing irreparable harm. While Defendants make potentially strong arguments as to why the damages may not be as high as Plaintiffs purport, the current facts point to a blatant misappropriation of information that harmed not only Plaintiffs' revenue—which by itself would likely not support Plaintiffs' arguments for irreparable harm, *see Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.")—but also its goodwill and future business relationships, which can qualify as irreparable harm. *See Leatt Corp. v. Innovative Safety Tech., LLC*, No. 09-CV-1301-IEG (POR), 2010 WL 1526382, at *11 (S.D. Cal. April 15, 2010) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill,

can qualify as irreparable harm."). And while Defendants propose to destroy the list in its possession, this would remedy only some of the problems stemming from the misappropriation. Therefore, Plaintiffs satisfy their burden with respect to this factor.

### III. Balance of Equities

"To qualify for injunctive relief, [a p]laintiff must establish that 'the balance of the equities tips in [its] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). A court has the "duty . . . to balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

Defendants raise only one argument in opposition which the Court finds unavailing. Defendants claim that they are "a new startup company with de minimis revenue." Opp'n at 15. While this may be true, they in no way have shown how precluding them from using Plaintiffs' protected trade secrets would cause them harm. The Court is not stopping Defendants from conducting business in their industry; Defendants simply cannot use Plaintiffs' ill-gotten trade secrets in doing so. Moreover, Defendants have vehemently denied using the list and claim they derive minimal revenue from the companies on Plaintiffs' list. *See, e.g.*, Fiorentino Decl. ¶ 23. If these claims of non-use are in fact true, the injunctive relief sought would cause very little damage to Defendants' business. Plaintiffs, on the other hand, have shown evidence that Defendants' continued use of the list will impact their business and goodwill with clients, thereby causing irreparable harm. *See supra* Section II. Accordingly, the Court finds the balance of equities tips in Plaintiffs' favor.

### IV. Public Interest

"The public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer. Public interest is also served by enabling the protection of trade secrets." *Henry Schein*, 191 F. Supp. 3d at 1078 (citing *Bank of Am., N.A. v. Lee*, No. CV 08-5546 CAS (JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008)). Here, requiring Defendants to abide

by trade laws and protect Plaintiffs' trade secrets serves the public interest. Thus, the fourth factor is satisfied.

**V.      Bond**

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." District courts retain discretion "as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted) (emphasis in the original).

Here, the Court finds there is not sufficient evidence that Defendants will incur any injury because of the injunction. The Court therefore does not require Plaintiffs to post a bond. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (finding no clear error where district court properly invoked discretion not to have plaintiffs post bond).

## CONCLUSION

For the reasons above, the Court **GRANTS** Plaintiffs' Motion for a preliminary injunction against Defendants (ECF No. 13).

**IT IS ORDERED** that, pending further order of the Court, Defendants are **ENJOINED** from divulging, using, disclosing, or making available to any third person or entity Plaintiffs' trade secrets or using Plaintiffs' trade secrets for the purpose of directly or indirectly competing with Plaintiffs. Defendants are further prohibited from soliciting any business from customers identified by Plaintiffs' trade secrets. Defendants may continue any business relationships with customers identified in Plaintiffs' trade secrets that were in existence before November 9, 2018; however, Defendants may not use Plaintiffs' trade secrets to enhance these pre-existing business relationships in any way.

**IT IS SO ORDERED.**

Dated: May 13, 2019

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge